Donnie Lee ROBERTS, Jr., Appellant,

v.

The STATE of Texas.

No. AP–75051.

Court of Criminal Appeals of Texas.

April 18, 2007.

Robert A. Morrow, Spring, for Appellant.

William Lee, Assistant Criminal District Atty., Livingston, Matthew Paul, State's Atty., Austin, for State.

KELLER, P.J., delivered the opinion of the Court in which WOMACK, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined.

Appellant was convicted of capital mur-

der.[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure, Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced him to death.[2] Direct appeal to this Court is automatic.[3] Appellant raises sixteen points of error. We find all of them to be without merit and therefore affirm.

## I. GUILT—Factual Sufficiency

 In point of error one, appellant contends that the evidence was factually insufficient to establish the underlying offense of robbery. In a factual sufficiency review, the evidence is reviewed in a neutral light rather than (as in a legal sufficiency review) in the light most favorable to the verdict.[4] Evidence can be factually insufficient in one of two ways: (1) when the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, and (2) when the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust.[5] We have recently explained that a reversal for factual insufficiency cannot occur when "the greater weight and preponderance of the evidence actually favors conviction."[6] Although an appellate court reviewing factual sufficiency has the ability to second-guess the jury to a limited degree, the review should still be deferential, with a high level of skepticism about the jury's verdict required before a reversal can oc-

cur.[7] We turn to a review of the evidence under these principles.

At the time of the murder, appellant lived with the victim, Vicki Bowen. Appellant was unemployed, often drank alcohol, and used cocaine. Bowen worked as a dental assistant. On October 15, 2003, she went shopping with co-worker Brenda Bland, but she did not show up for work the next day. Because Bowen was a punctual person who always called if she was going to be late, Bland became concerned and went to Bowen's house to check on her. When Bland arrived at the home, she found the front door open. After knocking and receiving no answer, Bland entered the home and found Bowen dead. Bland noticed that Bowen was still in the scrubs she had worn at work the previous day. She was covered by a blanket and was lying face down with her head turned to the side in a pool of blood. Blood spatters were present in the living room on the coffee table, the couch, and the walls. The medical examiner would later determine that Bowen died from two gunshot wounds to the head.

It was immediately apparent from an examination of the scene that Bowen's television and her son's truck were missing. That same day, the police found appellant after tracking down the stolen truck. It was later determined that appellant had taken the truck, the television, Texans/Titans football tickets, jewelry, a

1. TEX. PEN.CODE § 19.03(a)(2)("A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and ... the person intentionally commits the murder in the course of committing or attempting to commit ... robbery.")

2. Art. 37.071, § 2(g). Unless otherwise indicated, all references to articles are to the Texas Code of Criminal Procedure.

3. Art. 37.071, § 2(h).

4. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim. App.2000).

5. *Watson v. State*, 204 S.W.3d 404, 414–415 (Tex.Crim.App.2006); *Johnson*, 23 S.W.3d at 11.

6. *Watson*, 204 S.W.3d at 417.

7. *Id.; Cain v. State*, 958 S.W.2d 404, 407, 410 (Tex.Crim.App.1997).

Western Union money order, a .22 rifle, and a .22 pistol. Appellant had sold the football tickets for one hundred dollars. He had bought cocaine from Edwin Gary on October 15 on three different occasions, the last of which involved trading the .22 caliber pistol. Appellant had apparently abandoned the .22 rifle, later determined to be the murder weapon, a few blocks from where he was found. The Western Union money order was found in the residence at which appellant had parked his truck, but the television and the jewelry were never recovered.

Appellant was interviewed and gave a confession. In that confession, he acknowledged that he had "a crack cocaine problem" and that he would go to bars, get drunk, and then look for drugs. With regard to the victim's death, appellant said, "I pointed the gun at her and I told her just give me some money." Later in the interview, appellant stated:

> I pointed the gun at her and I said, "if you'd just give me some money." And she said "No." And then I said, "Look, it doesn't have to be this way." That's all I remember saying to her. And the next thing I know, I shot her.

At trial, appellant testified to a different sequence of events. He claimed that he picked up the .22 rifle because it was out of place, near the door. He also claimed that he saw what looked like a .22 pistol in Bowen's pocket and that she moved her hand to her pocket to reach for it. He then said that he "must have chambered a round into the .22 rifle at that time," but he did not remember if he pulled the safety off. He also claimed that he did not remember his gun firing but that he knows it did. Appellant further testified that he did not intend to rob Bowen at the time he shot her, but he admitted to taking items of her property later.

■ Appellant begins his argument by saying, "It may seem bold to claim that the evidence is insufficient to prove capital murder where the defendant said he pointed a gun at the victim and told her to give him the money." He claims that the evidence is nevertheless factually insufficient because there was "no other evidence to show that a robbery took place." He claims that his request for "the money" was a request for twenty dollars that Bowen typically left for him in the morning. He also asserts that he and the victim shared expenses and that testimony at a pre-trial hearing established that he gave Bowen ninety-five percent of his pay when he was working. He concedes that he took property from the house for the purpose of obtaining cocaine but contends that the removal of the property was a mere afterthought. He concludes that any dispute over money was a domestic dispute rather than a robbery.

By his own admission, appellant pointed a gun at the victim and demanded money from her immediately before he killed her. Appellant does not claim that the money he demanded was actually his, and he implicitly concedes that some of the evidence that might support such an assertion was never presented to the jury. Even if it had been, the evidence at trial showed that appellant was unemployed at the time of the shooting, and therefore, the jury could legitimately conclude that the money demanded was not the result of shared finances. Moreover, appellant attempts to buttress his suggestion that he and the victim were arguing over a sum the victim regularly paid him by characterizing his videotaped description of his demand as "give me *the* money." But our review of the videotape indicates that appellant said, "give me *some* money," which suggests he was not talking about a previously-agreed-upon payment. Even if we were to assume, however, that he was demanding

only money that the victim had regularly paid him in the past, it would be more than understandable for the victim to decide that she would not continue to advance sums of money to support his drug habit. That he believed she should continue to give him money did not absolve him of the intent to take money he knew did not belong to him or of his threat (and ultimately use) of deadly force to accomplish that objective.

Moreover, several items of the victim's property were discovered missing at the same time the victim's body was discovered, and it was determined that appellant possessed these items either the day of the murder or the next day. A jury could have inferred that appellant took these items shortly after the murder. And from that conclusion, the jury could have further inferred that the murder was committed during the course of a robbery.[8]

Finally, we observe that a "domestic dispute" was not the only apparent possible motive for murder. By his own admission, appellant had a "crack cocaine problem," and his statements suggested that he also had an alcohol problem. That he bought cocaine on three different occasions on the same day further supports a conclusion that appellant had a cocaine addiction. Statements in appellant's confession, along with his conduct, amply support the conclusion that he needed money to purchase the drugs to satisfy this habit. The evidence was factually sufficient to support the underlying offense of robbery. Point of error one is overruled.

## II. PUNISHMENT

### A. Factual Sufficiency

In point of error two, appellant contends that the evidence was factually insufficient to support the jury's answer to the future-dangerousness special issue. We have consistently declined to conduct a factual-sufficiency review in this context,[9] and appellant's arguments do not persuade us to retreat from those holdings.[10] Point of error two is overruled.

### B. Evidence

#### 1. *Investigator's Notes*

In point of error three, appellant contends that the trial court erred when it ordered the defense to turn over its investigator's notes to the prosecution for cross-examination of the defense punishment-phase witnesses. Appellant further claims that this error was "structural," and thus immune from a harmless error analysis, because his right to counsel was violated.

Appellant's investigator was a "mitigation specialist" who talked to a number of defense witnesses who testified at the punishment phase of the trial. The investigator took notes relating to these interviews. From the record of the conversations between the trial court and the parties set out in appellant's brief, it appears that the notes involved some direct quotations of statements by witnesses and some opinions of the investigator. The trial court permitted defense counsel to excise the latter from the notes before turning the

---

8. *Cooper v. State*, 67 S.W.3d 221, 224 (Tex. Crim.App.2002).

9. *Renteria v. State*, 206 S.W.3d 689, 707 (Tex. Crim.App.2006); *Russeau v. State*, 171 S.W.3d 871, 878 n. 1 (Tex.Crim.App.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 2982, 165 L.Ed.2d 989 (2006); *Blue v. State*, 125 S.W.3d 491, 496 (Tex.Crim.App.2003); *Conner v.*

State, 67 S.W.3d 192, 199 (Tex.Crim.App. 2001); *Brooks v. State*, 990 S.W.2d 278, 285 (Tex.Crim.App.1999); *McGinn v. State*, 961 S.W.2d 161, 166–169 (Tex.Crim.App.1998).

10. Appellant relies in part upon *Zuniga v. State*, 144 S.W.3d 477 (Tex.Crim.App.2004). We note that *Zuniga* was recently overruled in *Watson*, 204 S.W.3d at 415–420.

notes over to the prosecution. The notes relating to a particular witness were turned over after that witness testified.

Appellant has failed to include in his brief any record citations showing that the redacted notes were ever made a part of the record or that a bill of exceptions outlining the content of these notes was filed. In fact, by saying, "[p]ortions of the notes may have been excised; it is hard to tell from this record," his brief suggests that the notes were not in fact made a part of the record. The State responds that the notes are not in the record and no bill of exception regarding the notes was ever filed. A party has an obligation to make appropriate citations to the record in support of his argument.[11] If the notes are in the record, appellant has failed to include the proper record references. If, as seems more likely, the notes are not in the record, then appellant procedurally defaulted error by failing to include a matter in the record necessary to evaluate his claim.[12]

After a witness testifies, Rule 615 permits the opposing party to compel disclosure of, among other things, "a substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical, or other recording or a transcription thereof."[13] It appears that the trial court's action may have been proper under Rule 615. But we cannot know whether the notes contained matters outside the scope of the rule without having the notes available to review.

■ The absence of the notes also impedes any attempt to conduct an accurate harm analysis. Without knowing what information was conveyed to the prosecutor that should not have been, we have no way of determining how the supposed error might have impacted the proceedings. If the alleged error were structural, as appellant contends, we would not need to make such a determination, but we find unpersuasive appellant's contention that the alleged error is structural because of the impact a work-product violation has on the right to counsel. To qualify as "structural," an error involving the constitutional right to counsel must amount to a complete denial of counsel,[14] which is not the case here. In fact, whether a failure to properly follow the rule of evidence regarding the sharing of witness statements amounts even to *constitutional* error is questionable.[15] Point of error three is overruled.

### 2. *Expert Testimony*

■ In point of error five, appellant contends that the trial court erred in refusing to allow a defense expert to testify that appellant's use of alcohol and cocaine caused him to commit the crime. He argues that the excluded testimony was constitutionally relevant mitigating evidence, that there was no reason for the trial court to exclude the evidence, and that "[e]very other expert in the punishment phase testified to ultimate facts, including that [appellant] will or will not be a future danger to society."

11. Tex.R.App. P. 38.1(h).

12. Tex.R.App. P. 33.2.

13. Tex.R. Evid. 615(f)(2).

14. *Johnson v. United States,* 520 U.S. 461, 468–469, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *see also Johnson v. State,* 169 S.W.3d 223, 229 (Tex.Crim.App.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1355, 164 L.Ed.2d 66 (2006).

15. *See Potier v. State,* 68 S.W.3d 657 (Tex. Crim.App.2002).

Appellant's brief fails to address the reason the trial court did exclude the evidence: that appellant had failed to make the requisite showing of reliability under Rule 702.[16] Consequently, appellant's briefing is inadequate, and his point of error is subject to rejection on that ground alone.[17] Nevertheless, we turn to the merits.

The trial court conducted a "gatekeeping" hearing with regard to proposed testimony from defense expert Katherine McQueen, a medical doctor who conducted clinical research in the treatment of alcohol and drug disorders, and more specifically with regard to treating "alcohol and cocaine dual dependence." In preparation for her testimony, Dr. McQueen reviewed appellant's probation records, treatment records, a medical report, and notes of the investigator's interviews with appellant's family members. She also personally interviewed appellant.

During the hearing, Dr. McQueen expressed the opinion that "the event would not have occurred without both his diagnoses [alcohol and cocaine dependence] and the presence of [these] substances." When asked by the prosecutor, "So is this another way of saying that you believe that alcohol dependence and cocaine dependence caused him to commit capital murder," she replied, "I would not say that." When asked for clarification, Dr. McQueen said, "There is a correlation."

The prosecutor then asked her what scientific literature supported her opinion, when the research was conducted, and who the researchers were. Dr. McQueen specified a particular anthology of articles, but she was unable to identify the individual authors without looking at her notes or the book itself to refresh her memory, and she had brought neither her notes nor the book with her. When the trial court asked what the correlation was between ingesting the drugs in question and violence, Dr. McQueen stated that "lifetime patterns of violence are significantly higher in people who are dependent on both substances." The trial court then asked whether the studies yielded a particular percentage correlation. Dr. McQueen replied that she was "certain that there is," but she was unable to quote exact percentages without the studies in front of her. The trial court also asked whether there was an error rate, and Dr. McQueen replied that there was, but she did not specify it. The trial court then asked whether she had any materials with her regarding statistics on the matter. She replied that she had a book in her car, but when she later retrieved the book, she indicated that it was not the right book. Instead, she explained that it was an article in a different book and supplied the title and authors.

The prosecutor then proceeded to question Dr. McQueen about that article:

Q. You don't have that literature with you, Doctor?

A. I do not.

Q. And can you explain to the Court, I guess, what you know about that research and how it was conducted and what the results of the article were?

A. I can—I can tell you the conclusions of the article were that individuals dependent on both cocaine and alcohol had more past incidences of family and other violent interactions. I would have to

---

**16.** "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex.R. Evid. 702.

**17.** *See* Rule 38.1(h)("The brief must contain ... appropriate citations to authorities").

look at the article before I would feel comfortable saying under oath exactly how the study was conducted.

Q. Okay. And you are not familiar with any of the statistics and, I guess, statistically how predisposed someone might be as a result of that study to engage in some sort of family violence?

A. No.

Q. Okay. So all you can say, based on your knowledge of that article, is as a general proposition there may be some correlation between drug and alcohol dependence and violence? Correct?

A. That's correct.

After this questioning, the prosecutor argued to the trial court that the defense had failed to meet the reliability requirements for admission of the expert's opinions under *Kelly v. State*.[18] In connection with this argument, the prosecutor alleged that the defense was seeking to elicit a "hard science opinion" rather than a "soft science opinion" when it sought to elicit testimony that "there was correlation or a causal or contributing effect between drugs and alcohol in this offense," and therefore, the trial court had less latitude in allowing this type of testimony. Out of an abundance of caution, the prosecutor stated that he would not object to the expert saying "that based on her knowledge of the literature there is a statistically significant correlation between drug and alcohol dependence and violence," but the prosecutor objected to any opinion about any effect the alcohol and cocaine dependence may have had with respect to the crime committed in this case.

At the end of the hearing, the trial court ruled in accordance with the State's position, permitting Dr. McQueen to testify as follows:

I'm going to let her say that she has reviewed all she has done in reviewing him. I'm going to let her say that she thinks he has an alcohol and cocaine addiction. And then I'm going to let her say the studies say that people with alcohol and cocaine addictions have a higher propensity for violence.

When appellant asked if the trial court meant to exclude an "opinion about whether that had some bearing on this offense," the trial court replied, "That's correct. The jury can infer whatever they want to from the evidence from that, Counsel."

Before the jury, Dr. McQueen testified that applicant suffered from cocaine dependence and alcohol dependence (both in remission due to his incarceration). She explained that the presence of both alcohol and cocaine in the body would cause the liver to metabolize these substances into a new substance called cocaethylene, which would cause the effects of cocaine to last longer. She also explained that studies showed that chronic abuse of alcohol would enable more cocaine to cross the blood/brain barrier, creating even greater effects on the substance abuser's mental state. She further testified that studies showed "a statistically significant increase in the level of violent activity" in a group of people who were dependent on both cocaine and alcohol than groups who were dependent on only one of the substances. She later clarified, "There is a very strong connection between substance use and dependence and violent acts and, in particular, between dependence on both alcohol and cocaine and violent acts." Appellant attempted later to ask the following question, but was prevented by the trial judge sustaining the prosecutor's objection: "So in your—your opinion, Dr. McQueen, was there some or is there some relationship to Donnie Roberts' dependence on alcohol,

18. 824 S.W.2d 568 (Tex.Crim.App.1992).

dependence on cocaine, dependence on a combination thereto in relationship to the events of the—of October 15th of 2003?"

During the State's cross-examination, Dr. McQueen acknowledged that she was not a psychiatrist or psychologist, but she admitted that personality played a role in both substance abuse and in criminal behavior. When asked how many subjects of the study involving the correlation between alcohol and cocaine dependence and violence had actually committed murder, she replied, "It would surprise me if any of them had." The State further pressed Dr. McQueen in the following colloquy:

Q. And there is no scientific data out there or anywhere that you are aware of that cocaine abuse or alcohol abuse or the combination of those two predisposes people to commit murder that aren't already inclined to commit murder; isn't that true?

A. In a—there are—there is evidence that up to 80 percent of people who are convicted of capital murder have alcohol and drug dependence.

Q. There is not any research there that supports a cause and effect relationship between the two, is there?

A. No.

Kelly v. State, 824 S.W.2d 568 (Tex. Crim.App.1992) requires that the proponent of scientific evidence show that (1) the underlying scientific theory is valid, (2) the technique applying the theory is valid, and (3) the technique was properly applied on the occasion in question.[19] In Nenno v. State, we suggested that the Kelly framework applied to the soft sciences but with "less rigor" than to the hard sciences.[20] Although the prosecutor contended that the issue was one of "hard science" rather than "soft science," we need not attempt to rigidly classify this evidence under one of those headings.[21] What we can say is that Dr. McQueen was a medical doctor, but not a psychiatrist or a psychologist. Because she lacked training with respect to mental health problems, one would not ordinarily expect from her an opinion about what might have contributed to a person's behavior with respect to a particular incident or how a person might behave in the future. Dr. McQueen did have training as a researcher with regard to the treatment of addictions, and that training appears to have included knowledge of the interaction between cocaine and alcohol in the body and studies showing a correlation between cocaine and alcohol usage and violence. Under this record, however, the trial court could reasonably conclude that the pharmacological knowledge and studies were not a sufficient basis from which to draw a scientific conclusion about how any particular individual would behave.[22] Of course, one might draw a layman's conclusion from evidence of a correlation between drug dependence and violence that a particular drug user's violence resulted from dependence, but that sort of conclusion is one that a jury is well-suited to make on its own, without the assistance of an expert.[23]

19. 824 S.W.2d at 573.

20. Nenno v. State, 970 S.W.2d 549, 561 (Tex. Crim.App.1998).

21. See id. at 560–561 (recognizing that "the distinction between" hard and soft science "may often be blurred").

22. See Hernandez v. State, 116 S.W.3d 26, 30–32 (scientific evidence should not be admitted on the basis of a record devoid of the proper showing of reliability).

23. See Schutz v. State, 957 S.W.2d 52, 69 (Tex.Crim.App.1997)("We should be cautious about permitting experts to draw conclusions that rest on both expert and lay knowledge.... Once the expert has imparted his specialized knowledge to the jury, the jury can use that knowledge, along with its own

Dr. McQueen was permitted to testify about the correlation between alcohol and cocaine usage and violence. In fact, she was permitted to opine that there was "a very strong connection between substance use and dependence and violent acts and, in particular, between dependence on both alcohol and cocaine and violent acts." Under the circumstances, we cannot conclude that the trial court erred when it decided to prevent Dr. McQueen from taking the extra step of opining whether alcohol and drug dependence was related to appellant's violent conduct. Point of error five is overruled.

### 3. *Victim Impact*

■ In point of error seven, appellant contends that his attorney was ineffective for failing to object to the admission of extraneous offense victim impact testimony. Elizabeth Thomas, the victim of a robbery appellant had committed in Baton Rouge a few years earlier, testified about the emotional impact that the robbery had on her life. She testified that she had to quit her job because she was afraid every customer who walked in might rob or kill her. She had difficulty sleeping and was troubled by nightmares. And she spent six months worth of her savings while looking for another job, and even when she found one, she still felt fear while at work. Appellant contends that this evidence was inadmissible as extraneous offense victim impact evidence under *Cantu v. State*.[24]

■ We disagree. "Victim impact" evidence is evidence of the effect of an offense on people *other* than the victim.[25] The evidence presented here was evidence of the effect of a different offense on *the victim* (of the extraneous offense), and thus is distinguishable from the situation presented in *Cantu*.[26] The evidence was admissible. But even if it weren't, counsel was not ineffective for failing to lodge an objection based upon a case that is clearly distinguishable from the present case. Point of error seven is overruled.

In point of error sixteen, appellant contends that the trial court erred in admitting victim impact and character evidence with regard to the victim of the charged offense. He contends that testimony from the victim's parents and the victim's son was prejudicial through its sheer volume as well as from its content. With regard to volume, he claims that the State should have been allowed to use only one victim impact witness. With regard to the content, appellant claims that the victim impact testimony should have been limited to "the effects which were intended, known, or reasonably apparent to the defendant at the time he committed the crime."

Neither of these contentions reflects the law. In *Mosley v. State*, we upheld a trial court's decision to permit three witnesses to testify.[27] And in that case we recognized that the State could, within limits, introduce victim impact evidence of which

lay knowledge of human nature, to arrive at its own conclusion.").

24. 939 S.W.2d 627, 637 (Tex.Crim.App.1997).

25. *Garcia v. State*, 126 S.W.3d 921, 929 (Tex. Crim.App.2004) (medical records of injured bystander admissible over "victim impact" objection); *Guevara v. State*, 97 S.W.3d 579, 583 (Tex.Crim.App.2003) (discussing meaning of "victim impact" testimony); *Mathis v.*

*State*, 67 S.W.3d 918, 928 (Tex.Crim.App. 2002) (testimony not "victim impact" evidence because not about effect on third person or about victim's character). *See also Payne v. Tennessee*, 501 U.S. 808, 817, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

26. *See* authorities in previous footnote.

27. 983 S.W.2d 249, 264–265 (Tex.Crim.App. 1998).

the defendant was not aware.[28] Moreover, the articulated limitations do not apply when the defendant was *aware* of the impact at the time of the crime because then the evidence would necessarily be relevant to future dangerousness and moral culpability.[29] Here, appellant knew the victim—in fact he lived with her—and, thus, a factfinder could reasonably conclude that he was aware of the impact that the crime would have on the victim's close family members.[30] Appellant points to only one item of testimony involving victim impact that he claims he could not have known: the victim's mother speculated in her testimony that the victim's death caused the victim's sister's cancer to become active again. But appellant did not object to this particular item of testimony. His attack on victim impact testimony in general, advanced before any testimony was heard, did not place the trial court on notice that appellant would find this particular testimony objectionable due to the unforeseeability of the event described.[31] Point of error sixteen is overruled.

### 4. *Execution Impact*

In point of error eight, appellant contends that the trial court erred when it refused to permit testimony regarding the effect a sentence of death would have on appellant's family while at the same time permitting testimony about how the victim's death affected her family. Specifically, he complains about the trial court's ruling with regard to defense witness Teresa Breaux, appellant's niece.

Breaux testified that, when she was growing up, she was often at her grandparents house, where appellant lived, and appellant was like a big brother to her. She testified to various fond memories she had of her and appellant playing together. She further testified that appellant taught her how to drive and how to defend herself. She recalled an incident in which a different uncle threatened the family and appellant played a role in defusing that threat. She also recalled that appellant gave her a place to live when she decided to rebel against her parents and marry at age seventeen. Later, appellant helped her fix up a dilapidated house she moved into, and appellant stayed overnight once to protect her from an individual who had threatened to rape her. She also testified that she loved appellant.

After all of this testimony, defense counsel approached the bench and requested permission to ask the witness "if [appellant] were given the death penalty how that would affect her." The prosecutor objected on the ground of relevance, and the trial court sustained the objection. Appellant did not attempt to make an offer of proof as to what the witness's testimony would have been.

■ To preserve error regarding the exclusion of evidence, the offering party must make an "offer of proof" conveying the substance of the proffered evidence.[32] Because appellant failed to do so, he failed to preserve error. Moreover, we have previously decided that a trial court does not abuse its discretion in excluding "execution-impact" testimony.[33] Point of error eight is overruled.

---

28. *Id.* at 261 n. 16, 262.

29. *Jackson v. State*, 33 S.W.3d 828, 833–834 (Tex.Crim.App.2000); *Mosley*, 983 S.W.2d at 261 n. 16.

30. *See Jackson*, 33 S.W.3d at 830, 833–834 (defendant murdered his wife; effect of murder on victim's father).

31. Tex.R.App. P. 33.1(a)(1)(A).

32. Tex.R. Evid. 103(a)(2).

33. *Jackson*, 33 S.W.3d at 834.

### 5. *Length of Sentence*

In point of error thirteen, appellant contends that the prosecutor improperly suggested to the jury that its verdict might not be the final determination of appellant's sentence due to possible reversal by a higher court. He further contends that this conduct violated a motion in limine and deprived him of due process. His brief refers to prosecutorial questioning during cross-examination of defense witness John Escobedo, a former member of the Board of Pardons and Paroles. However, although appellant filed a motion in limine, he did not object to the prosecutor's questions at the time they were asked and answered. Motions in limine do not preserve error.[34] Because appellant failed to lodge a proper objection, he failed to preserve error.[35] Even if his motion in limine had sufficed as a proper objection, however, that motion was *granted.* Consequently, appellant failed to obtain an adverse ruling from which to base an appeal.[36] Point of error thirteen is overruled.

In point of error fourteen, appellant contends that he was deprived of his constitutional right to the effective assistance of counsel when the defense attorneys failed to object to the prosecutor's repeated suggestion during questioning that a capital-life inmate might be released much sooner than the forty years the law requires him to serve before becoming eligible for parole. Appellant called Escobedo to testify about the procedures followed by the Board of Pardons and Paroles. Escobedo testified that a capital-life case was treated differently from other cases in that a two-thirds vote of the entire board was required to grant parole. He also explained that a defendant receiving a capital-life sentence under current law would be required to serve forty calendar years before becoming parole-eligible. Escobedo also discussed procedures relating to the consideration of parole and some of the factors the parole board would consider in determining whether to grant parole. In addition, he answered negatively when asked, "Could the board today in any way reduce a capital life sentence of 40 years?" During cross-examination, the prosecutor asked questions regarding various ways in which a capital life inmate might exit the prison system in less than forty years, including: retroactive change in the law lowering parole eligibility, early release in response to overcrowding, and escape. Appellant contends that discussion of the first two of these ways constituted improper speculation and that counsel should have objected.

We decline to find counsel ineffective on this basis on the record before us. As we have done many times before, we point out that the record on direct appeal is usually inadequate to address ineffective assistance claims.[37] Before granting relief on a claim that defense counsel failed to do something, we ordinarily require that counsel be afforded the opportunity to outline the reasons for the omission.[38] To warrant reversal without affording counsel such an opportunity, the challenged conduct must be "so outrageous that no competent attorney would have engaged in

---

34. *Martinez v. State,* 98 S.W.3d 189, 193 (Tex. Crim.App.2003).

35. Tex.R.App. P. 33.1(a)(1).

36. Rule 33.1(a)(2); *Cockrell v. State,* 933 S.W.2d 73, 89 (Tex.Crim.App.1996).

37. *Goodspeed v. State,* 187 S.W.3d 390, 392 (Tex.Crim.App.2005).

38. *Id.*

it."[39] In *Ripkowski v. State*, we held that defense counsel opened the door to testimony concerning possible changes in parole law by: "(1) eliciting testimony that parole laws had become tougher on inmates throughout the years, (2) eliciting testimony concerning the procedures of the Parole Board and the factors taken into account in determining whether to release someone, and (3) arguing that [the defendant] would never be released on parole."[40] At least the second *Ripkowski* factor was present in this case when Escobedo testified about the procedures followed by the parole board and some of the factors taken into account when determining whether to grant parole. And, arguably, Escobedo's testimony went further when he indicated that the parole board could not reduce the forty-year sentence. Counsel could have reasonably believed that the direct examination testimony opened the door to the cross-examination of which appellant now complains, and counsel could have reasonably believed that the initial direct examination testimony, even after the State's cross, was to his client's benefit. Point of error fourteen is overruled.

### C. Jury Instructions

In point of error four, appellant contends that the trial court's instructions relating to the mitigation special issue unconstitutionally narrowed the definition of mitigating evidence to that evidence which reduces the defendant's moral blameworthiness. In point of error six, he contends that the trial court erred in refusing to include in the charge his requested instruction defining mitigating evidence more broadly. He summarizes his mitigating evidence as falling into four categories: (1) his abused and neglected childhood, (2) alcohol and cocaine dependence, (3) low IQ, and (4) his good qualities as a father, family member, and worker. He concedes that the definition given in the charge is required by statute[41] but contends that the definition constitutes an improper screening test in violation of *Tennard v. Dretke*.[42] We have already decided this very claim adversely to appellant's position.[43] Moreover, appellant does not explain how the jury instructions that were given prevented the jury from giving effect to any of his alleged mitigating evidence, and we perceive no barrier to the jury doing so.[44] Points of error four and six are overruled.

In point of error ten, appellant contends that the mitigation special issue is unconstitutional because no burden of proof is assigned to it. In point of error eleven, he contends that the mitigation issue is unconstitutional because it does not impose a burden of proof on the State's "anti-mitigating" evidence. Citing *Prystash v. State*, appellant concedes that we have rejected these contentions many times.[45] He contends that he has a new argument

39. *Id.*

40. 61 S.W.3d 378, 394 (Tex.Crim.App.2001).

41. Art. 37.071, § 2(f)(4).

42. 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

43. *Perry v. State*, 158 S.W.3d 438, 449 (Tex. Crim.App.2004), *cert. denied*, —— U.S. ——, 126 S.Ct. 416, 163 L.Ed.2d 317 (2005).

44. *Morris v. State*, 940 S.W.2d 610, 615 (Tex.Crim.App.1996)("evidence of past abuse, mental illness, intoxication, drug addiction and remorse ... reflect upon the issue of moral blameworthiness"); *Norris v. State*, 902 S.W.2d 428, 448 (Tex.Crim.App.1995)(being a good father and employee did not require an instruction separate from the future dangerousness issue that was submitted).

45. 3 S.W.3d 522, 535 (Tex.Crim.App.1999).

based on recent decisions of this Court and the United States Supreme Court, but the only case he cites in support of his argument that postdates *Prystash* is the Supreme Court's decision in *Blakely v. Washington.*[46] We have previously rejected the argument that the *Apprendi*[47]-*Ring*[48]-*Blakely* line of cases requires a burden of proof with regard to the mitigation special issue.[49] Points of error ten and eleven are overruled.

### D. Closing Argument

In point of error twelve, appellant contends that the trial court erred in refusing his request to give the concluding argument at punishment on the mitigation special issue. He concedes that we held contrary to his position in *Masterson v. State,*[50] but he requests that we reconsider that decision. Nothing in his argument convinces us that our decision in *Masterson* was incorrect. Point of error twelve is overruled.

### E. Challenges to the Death Penalty

In point of error nine, appellant contends that the death penalty should have been precluded in his case because the grand jury did not pass on the punishment special issues when deciding whether to indict him. As authority, he relies upon the *Apprendi–Ring–Blakely* line of cases.

We have rejected this claim with respect to *Apprendi* and *Ring*, and *Blakely* does not appear to affect our rationale in doing so.[51] Point of error nine is overruled.

In point of error fifteen, appellant contends that the Texas death-penalty scheme is unconstitutional because it fails to provide uniform statewide standards to guide prosecutors in deciding when to seek the death penalty. He contends that this failure constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment. We have previously rejected the notion that there should be "a statewide policy or standard for determining in which cases the State will seek the death penalty as opposed to leaving the decision in the hands of the individual district attorneys."[52] Appellant relies upon *Bush v. Gore,*[53] but we have rejected the notion that a disparity in death-penalty decision-making from county to county violates the principles articulated in that decision.[54] Point of error fifteen is overruled.

The trial court's judgment is affirmed.

MEYERS, J., filed a dissenting opinion in which PRICE and JOHNSON, JJ., joined.

MEYERS, J., dissenting, in which PRICE and JOHNSON, JJ., joined.

In point of error seven, the majority says that *Cantu v. State*, 939 S.W.2d 627

**46.** 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

**47.** *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**48.** *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**49.** *Perry*, 158 S.W.3d at 446–448.

**50.** 155 S.W.3d 167, 174–175 (Tex.Crim.App. 2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 1330, 164 L.Ed.2d 47 (2006).

**51.** *Russeau*, 171 S.W.3d at 886; *Rayford v. State*, 125 S.W.3d 521, 533 (Tex.Crim.App. 2003).

**52.** *Crutsinger v. State*, 206 S.W.3d 607, 611–613 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 127 S.Ct. 836, 166 L.Ed.2d 670 (2006); *Hankins v. State*, 132 S.W.3d 380, 387 (Tex. Crim.App.2004).

**53.** 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

**54.** *Threadgill v. State*, 146 S.W.3d 654, 671–672 (Tex.Crim.App.2004)(citing *Rayford*, 125 S.W.3d at 534).

(Tex. Crim. App. 1996), does not apply to appellant's situation. Because the evidence in question was presented by the victim of an extraneous offense and because the testimony related to the impact that offense had on her life, the majority concludes that it is not victim-impact evidence.

I agree that this evidence is distinguishable from the evidence presented in *Cantu*. The evidence relating to the extraneous offense in *Cantu* was presented by the victim's mother whereas in this case, the evidence was presented by the victim of the extraneous offense herself. And, in *Cantu*, the victim's mother testified about how the crime impacted their family and about what kind of person the victim was, while here, the victim of the extraneous offense testified about how the prior offense affected her own life. We stated in *Cantu*:

> The danger of unfair prejudice to a defendant inherent in the introduction of "victim impact" evidence with respect to a victim not named in the indictment on which he is being tried is unacceptably high. The admission of such evidence would open the door to admission of victim impact evidence arising from any extraneous offense committed by a defendant. Extraneous victim impact evidence, if anything, is more prejudicial than the non-extraneous victim impact evidence found by this Court to be inadmissable in *Smith* [*v. State*, 919 S.W.2d 96 (Tex. Crim. App. 1996)]. We hold that such evidence is irrelevant under Tex. R. Crim. Evid. 401 and therefore irrelevant in the context of the special issues under Art. 37.071.

939 S.W.2d at 637.

In the case before us, the majority seems to imply that when the mother of a victim of an extraneous offense testifies about the impact a crime had on her fami-ly, then that testimony is inadmissible extraneous victim-impact evidence under *Cantu*. But, when the victim herself testifies about how an extraneous offense affected her own life, it is admissible. However, it should not matter who presented the evidence. Even if we choose not to call evidence presented by the victim of an extraneous offense "victim-impact evidence," the evidence is still equally prejudicial and should be inadmissible.

While the extraneous offense itself may have been admissible, the effect that the extraneous offense had on the victim of that crime or her family was irrelevant to the matter of future dangerousness. The majority should focus on the real issue in this case-that the evidence is irrelevant and inadmissible-not whether it was "victim-impact evidence" presented by the family of the victim.

Like the evidence in *Cantu*, this testimony regarding the impact of an extraneous offense was unfairly prejudicial and was not relevant to the special issues. Because it was not relevant to the sentence, the testimony was inadmissible under Rule of Evidence 402. And, unless we can determine beyond a reasonable doubt that the testimony did not contribute to the death sentence, we cannot say that the presentation of this inadmissible testimony was harmless. Therefore, U respectfully dissent.