In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________


 

NO. 09-08-00501-CR


____________________



CURTIS ROBINSON, JR., Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 253rd District Court


Liberty County, Texas


Trial Cause No. CR25152






 MEMORANDUM OPINION


 A jury found Curtis Robinson, Jr. guilty of capital murder. Robinson's indictment
alleged that during a robbery on September 9, 2004, he killed Daniel Tebo by cutting his
neck. Robinson elected to have the trial court assess his punishment. The State did not seek
the death penalty, and the trial court assessed Robinson's punishment at life imprisonment. (1) 
The trial court's judgment provided that Robinson's sentence was to run consecutively to a
prior sentence of life imprisonment, imposed for a conviction of aggravated robbery (habitual
offender) on September 11, 2004. See Robinson v. State, No. 09-06-051 CR, 2006 WL
3438076, at **1,5 (Tex. App.-Beaumont, Nov. 29, 2006, no pet.) (affirming the conviction). 

 On appeal, Robinson raises three issues. First, he challenges the factual sufficiency
of the evidence. Second, Robinson contends certain prejudicial photographs were
erroneously admitted into evidence, and third, he asserts the evidence does not support a
finding that a robbery was committed or attempted during the course of the murder. We
affirm. 

Issue One: Factual Sufficiency of the Evidence


 In his factual sufficiency challenge, Robinson contends that the jury's verdict is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

Standard of Review


 When conducting a factual-sufficiency review, we view the evidence in a neutral
light. Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007). "Only one question
is to be answered in a factual-sufficiency review: Considering all of the evidence in a neutral
light, was a jury rationally justified in finding guilt beyond a reasonable doubt?" Grotti v.
State, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008). Evidence can be factually insufficient
in one of two ways: (1) when the evidence supporting the verdict is so weak that the verdict
seems clearly wrong and manifestly unjust, and (2) when the supporting evidence is
outweighed by the great weight and preponderance of the contrary evidence so as to render
the verdict clearly wrong and manifestly unjust. Id. 

 Although an appellate court may "second-guess the jury to a limited degree, the
factual-sufficiency review should still be deferential, with a high level of skepticism about
the jury's verdict required before a reversal can occur." Id. We "afford almost complete
deference" to a jury's decision that is based upon an evaluation of a witness's credibility, and
we are mindful that the jury is the sole judge of the weight to be given to a witness's
testimony. Lancon v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

 Appellate courts apply the same standard of review to circumstantial evidence as is
applied to direct evidence. Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). 
"Circumstantial evidence is as probative as direct evidence in establishing the guilt of an
actor. Circumstantial evidence alone is sufficient to establish guilt." Id. (footnotes omitted).
"Each fact need not point directly and independently to the guilt of the appellant, as long as
the cumulative effect of all the incriminating facts are sufficient to support the conviction." 
Id. (footnotes omitted).


Evidence



 Daniel Tebo was a known drug dealer who lived in Ames, Texas. Daniel's family last
saw him alive on the evening of September 9, 2004, at the home he shared with his wife,
Bernice Tebo. Bernice saw him during the evening around half past eight, and his son,
Garland Tebo, saw him later around ten o'clock. The next morning Bernice found Daniel's
body by their garage and called law enforcement officials.

 After officers with the Liberty County Sheriff's Department arrived at the Tebo home,
they determined that Daniel's car was missing and began looking for the vehicle, a 1978
Chevy Nova. The officers found the Nova that afternoon at Hilton's Grocery.

 Deannon Best and her husband, Brian Best, both testified that Robinson was a stranger
to them prior to September 9. On that night, Robinson arrived at their home after 10 p.m., and
the three smoked crack from approximately 11 p.m. until the early morning hours. According
to Deannon, the next day (September 10), Robinson drove the Nova to Hilton's grocery and
left it in the parking lot. After the Bests and Robinson unsuccessfully attempted to find more
crack cocaine, the Bests took Robinson back to the store to get the Nova. Deannon testified
that when they arrived at the store, the police were inspecting the car and Robinson instructed
them: "[D]on't stop. Don't stop. Just keep going." To explain why the police were around
his car, according to Deannon, Robinson said the police probably were towing his car because
its inspection sticker must have expired. At Robinson's request, the Bests took Robinson to
a house off Governor's Road, some thirty minutes away, where he got out of their vehicle and
walked away.

 After the Bests learned that the Nova's owner had been murdered, they decided to go
to the Liberty police station, and ultimately they gave statements to the Liberty County
Sheriff's Department. At trial, the Bests admitted that they initially told investigating
officers that they met Robinson when he ran out of gas and they offered to give him a ride. 
They explained that they lied in their first statements because they did not want authorities
or their family to know about their drug use. Deannon testified that she never represented
to the officers that anyone other than Robinson "was in" the Nova. When the trial took place,
Deannon explained that she and her husband resided in a rehabilitation center where they
were attempting to overcome their addictions.

 The jury also heard evidence about Robinson's activities before he met the Bests. 
Two witnesses testified that at around ten o'clock on the evening of September 9, they spoke
to Robinson, who was walking down a road approximately a mile from Daniel Tebo's
residence. The witnesses, Rebecca Brooks and Wanda Joyce Washington, were sitting on
the front porch of Brooks's home when they saw Robinson, whom they both knew. He asked
for a cigarette, talked with them for about ten minutes, and then walked away by himself.

 On that same evening, Robinson drove a car to Ralph Lawson's home. Lawson
testified that he heard Robinson's car drive up but also explained that he did not see it.
According to Lawson, Robinson said that he had a lot of crack cocaine to smoke and asked
Lawson to join him. Lawson declined. At this point, Brian Best, who knew Lawson, arrived
and attempted to buy crack from Robinson. Instead, Robinson offered to give Best some
crack if he had a place where they both could "chill and smoke." Fifteen minutes later,
Robinson and Best left Lawson's home in separate vehicles and went to Best's home to
smoke the crack with Best's wife, Deannon. 

 The jury also heard testimony from witnesses who were with Robinson on the day of
his arrest. On the afternoon of September 12, 2004, Robinson unexpectedly arrived in Austin
at the home of friends, Rose and Gary Reynolds, who both testified at trial. Robinson was
tired, nervous, and dirty when he arrived at the Reynoldses' home. After Robinson and Gary
talked, Gary washed Robinson's dirty clothes while Robinson took a shower. Because he
was concerned that Robinson was emotionally disturbed, Gary called someone with the
"mental health/suicide watch[.]" When Austin police officers responded to Gary's telephone
call, they arrested Robinson based upon an outstanding warrant in Liberty County for
Robinson's alleged unauthorized use of a motor vehicle. 

 The officers collected Robinson's washed clothes, had him put on a pair of black
shoes he identified as his, and took him to the Travis County jail. Forensic evidence
presented by the State established that a bloodstain was on one of Robinson's black shoes.
A DNA analyst concluded that Daniel Tebo was the source of the bloodstain. Gary
Reynolds, however, testified that when Robinson arrived, Robinson was wearing "[t]ennis
shoes of a sort." Then, Gary said: "It seems like I would have washed them too, but I don't
remember the shoes. . . . Maybe they weren't tennis shoes because I didn't wash them." Gary
also conceded that he remembered talking with a Texas Ranger, and he testified that he
"could have" told the Ranger that Robinson was wearing black shoes when he arrived.

 While the bloodstained shoe is circumstantial evidence linking Robinson to Daniel's
murder, other items tested or examined by investigators failed to do so. No bloodstains were
found on Robinson's shirt and pants. Investigating officers found no apparent blood on the
Nova's steering wheel, and they did not find Robinson's prints on the Nova. Grover Huff,
a sergeant with the Texas Rangers, testified there was no indication that Daniel's wallet had
been rifled through. Captain Phillip Fairchild, who was the lead investigator on the case for
the Liberty County Sheriff's Department, testified that he did not find any bloody hand prints
or shoe prints of blood at the scene. 

 The evidence during the trial offered an explanation to show how Daniel's murderer
could have avoided significant blood splatter on himself and his clothing. Ranger Huff
testified that Daniel was "below standing height" when his carotid artery was severed,
perhaps kneeling or "on all fours." Ranger Huff explained that "the cut was started on the
left side, come across the throat, and ended up by the right earlobe. It appeared . . . that the
person doing the cutting was standing behind him." Huff testified: "With the location of this
wound and my opinion that the assailant was behind Mr. Tebo at the time the injury occurred,
I believe it's possible that he would have gotten some blood on him. But I don't believe it
would have been a great deal." Dr. Tommy Brown, a forensic pathologist, described how
Daniel's assailant might have avoided getting much blood on himself given the cut to the
right side of Daniel's neck.

 Captain Fairchild testified it was apparent that a struggle took place at the scene. 
Fairchild explained that when business cards were picked up from the ground, there was a
void place in the blood spatter, which represented where the cards had been. Fairchild
concluded that the cards were down on the ground prior to Daniel's throat being cut and
blood spattering on the cards. Fairchild further testified that the evidence showing a robbery
occurred included: 1) circumstances showing that someone attempted to go through Daniel's
pocket, 2) a wound that was "obviously not accidental," and 3) Robinson's possession of
Daniel's missing car that Daniel did not give permission for anyone to have.

 Garland, Daniel's son, testified that Daniel seldom allowed him to use the Nova, that
Daniel did allow his niece to use it, but that Daniel had never allowed anyone else to drive
it. Garland also testified that Daniel's being a drug dealer was common knowledge, that
Daniel usually kept "the day's" money in his shirt pocket and that he often had a "substantial
amount of money in his pocket." According to Garland, Daniel also kept business cards in
his shirt pocket and always kept one of two pocket knives, either a yellow, double-bladed one
or a brown one.

 Investigators found no knives at the scene or on Daniel's body, according to Captain 
Fairchild. Brian Best, however, testified that Robinson had a light yellow or off-white knife,
approximately four inches long, that he threw out of the window of Brian's vehicle on the
day after Daniel's murder.

 The State also presented canine scent identification evidence that is consistent with
the State's contention that Robinson had encountered Daniel. Ranger Huff obtained a "scent
pad" from the clothing worn by Daniel Tebo at the time of his death. Captain Fairchild took
a "scent pad" from the pants Robinson was wearing when he arrived in Austin. Fairchild
then took the scent pads collected from Daniel's and Robinson's clothes to Deputy Keith
Pikett for a "scent lineup."

 Pikett, who is employed by the Fort Bend County Sheriff's Department, testified at
trial. According to Pikett, he trains bloodhounds to differentiate one human scent from
another or "scent discriminate." The dogs must demonstrate consistency in running trails, in
getting "to where they're supposed to get at the end of the trail," and in identifying the
correct person. After doing so, the dogs are taught to do lineups. 

 Pikett explained his procedure for scent lineups. He uses six paint cans that are
numbered one through six, and each can contains a gauze pad with a different scent. Then
he gives the dog a scent that may match one of the scents in the cans to see if the dog alerts
on one of the cans. In the scent lineup for this case, Quincy, one of Pikett's bloodhounds,
alerted on can three, which contained Robinson's scent. Jag, a younger bloodhound, also
alerted on can three but did so without checking the last three cans. Because of the alerts,
Pikett concluded that Robinson's scent was on the victim's shirt. Pikett also testified that
Quincy had identified the wrong scent only twice in 3300 cases. 

Analysis


 Citing Burns v. State, 676 S.W.2d 118 (Tex. Crim. App. 1984), Robinson argues that
because the evidence in this case is circumstantial, the evidence is sufficient to support a
conviction only if the proved facts support a reasonable inference that he committed the
crime and exclude to a moral certainty any inference consistent with his innocence. The
"reasonable hypothesis analytical construct" employed in Burns, however, was abrogated by
the Texas Court of Criminal Appeals in 1991. Geesa v. State, 820 S.W.2d 154, 159, 161
(Tex. Crim. App. 1991), overruled on other grounds by Paulson v. State, 28 S.W.3d 570, 573
(Tex. Crim. App. 2000). The Geesa Court rejected the construct's use as a method of
appellate review for evidentiary sufficiency. Id. Thus, we do not employ the construct in our
analysis.

 In performing a factual sufficiency review, we must give deference to the fact finder's
determinations if supported by evidence and may not order a new trial simply because we
may disagree with the verdict. See Watson, 204 S.W.3d at 417. As an appellate court, we
are not justified in ordering a new trial unless there is some objective basis in the record
demonstrating that the great weight and preponderance of the evidence contradicts the jury's
verdict. See id. In addition, an appellate opinion addressing factual sufficiency must include
a discussion of the most important evidence that appellant claims undermines the jury's
verdict. Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).


 Much of the State's case tying Robinson to Daniel's vehicle relies on the testimony
of Brian and Deannon Best. On appeal, Robinson's main argument challenging the
sufficiency of the evidence attacks the credibility of the Bests' testimony, which Robinson
concedes is "damaging." He argues that the only evidence he drove Daniel's car is unreliable
because it came from two crack addicts, the Bests. As Robinson asserts, the record shows
that both of these witnesses lied to officers about the circumstances under which they met
Robinson. Moreover, defense counsel cross-examined the Bests extensively about their
lifestyle and truthfulness. Thus, the jury was aware that the Bests were addicts when Paul's
murder occurred, and that they considered getting high as being a normal part of their lives.
At trial, however, Deannon testified that she truthfully identified Robinson as the person who
had the Nova, and Brian testified that he truthfully identified Robinson as the person he met
at Lawson's and as the person he accompanied to Hilton's grocery. Deannon also testified
that she and her husband were living at a rehabilitation center at the time of trial in an effort
to overcome their addictions.

 Because the jury heard the Bests' testimony, it had the opportunity to observe their
demeanor. Therefore, the jury was in the best position to determine their credibility and to
determine the weight to be given to their testimony. See Lancon, 253 S.W.3d at 705. The
Bests' versions of events, on this record, do not appear to us to be incredible, and are
supported by other circumstantial evidence that the jury duly considered. Thus, we conclude
that the jury reasonably could have believed the Bests and could have determined that shortly
after Daniel's murder, Robinson was in possession of Daniel's vehicle and substantial
amounts of crack cocaine. Based on the Bests' testimony, the jury also could reasonably
have concluded that after seeing officers investigating Daniel's car at the grocery store,
Robinson fled, an action from which the jury could infer guilt. See Clayton v. State, 235
S.W.3d 772, 780 (Tex. Crim. App. 2007) ("[A] factfinder may draw an inference of guilt
from the circumstance of flight."). Further, the jury reasonably could have believed Brian's
testimony that Robinson threw a knife away on the day after Daniel's murder.

 As to the bloodstain evidence found on Robinson's shoe, Robinson argues that Gary's
testimony casts doubt on whether the shoe belonged to him. Gary's trial testimony about the
shoes that Robinson had on when he arrived was equivocal. On one hand, Gary said
Robinson was wearing tennis shoes when he arrived in Austin. Then, Gary testified that
perhaps Robinson was not wearing tennis shoes because Gary did not remember washing
them, something he would have done had Robinson been wearing them. Gary also conceded
the possibility that he made a prior inconsistent statement to an investigator regarding
whether Robinson was wearing black shoes when he arrived at Gary's home. Further, when
he was arrested, Robinson put the black shoes on when they were brought to him and did not
claim at that time the shoes did not belong to him. Based on the record, the jury reasonably
could have concluded that the black bloodstained shoe belonged to Robinson. 

 In summary, the jury had substantial evidence from which it could make reasonable
inferences and conclude that Robinson was the assailant. The cumulative effect of all of the
incriminating facts, in our opinion, is sufficient to support the jury's verdict. In this case, the
circumstances that are the most probative of Robinson's guilt are: 1) he had Daniel's Nova
shortly after Daniel was last seen alive; 2) after he knew a police investigation was underway,
he abandoned the Nova; 3) he was later found with a bloodstained shoe, and the blood on the
shoe matched Daniel's DNA. Viewed neutrally, the evidence that Robinson murdered Daniel
is not so weak that the verdict is clearly wrong and manifestly unjust, nor is the verdict
contradicted by the great weight and preponderance of the evidence. See Watson, 204
S.W.3d at 414-15. Issue one is overruled.



Issue Two: Prejudicial Photographs


 In issue two, Robinson contends the trial court erred in failing to sustain his objection
to prejudicial photographs. The photographs in question are State's Exhibits 81, 85, 86, 87,
and 114. Robinson generally argues that these photographs, taken of the victim at the crime
scene and at the autopsy, were cumulative, gruesome, and more prejudicial than probative.
The State argues that the photographs were either medically necessary for the forensic
pathologist to explain Daniel's injuries and cause of death or to prove the elements of the
State's case beyond a reasonable doubt. 

 The admissibility of photographs is within the trial court's sound discretion. Paredes
v. State, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004). Usually, photographs are admissible
if verbal testimony about the matters depicted in the photographs is admissible. Id. Photos
depicting the condition of the victim's body when recovered are generally not considered to
be so prejudicial as to outweigh their probative value. See id. at 539-40 (citing Tex. R. Evid.
403). Further, the trial court does not err simply because it admits gruesome photographs into
evidence. Id. at 540. "[W]hen the power of the visible evidence emanates from nothing
more than what the defendant has himself done we cannot hold that the trial court has abused
its discretion merely because it admitted the evidence." Id.

 In this case, defense counsel did not object to the testimony of Ranger Huff about
Exhibit 81, which showed a large laceration on Daniel's throat and the loss of a large amount
of blood. Similarly, counsel did not object to the testimony of Dr. Tommy Brown, a forensic
pathologist who performed the autopsy, when he explained that other challenged exhibits
showed the fatal injuries caused by the knife, which severed Daniel's carotid artery and 
sliced through his gullet. Because the photographs show nothing more than what Daniel's
murderer did, we decline to find that the trial court abused its discretion in admitting the
photographs into evidence. See id. Issue two is overruled.


Issue Three: Robbery


 In issue three, Robinson contends the evidence fails to support a finding that a robbery
was committed or attempted during the course of Daniel's murder. Robinson asserts that
there is no evidence to support a finding of robbery. Thus, based on Robinson's argument,
we construe issue three to claim that the evidence of the robbery is legally insufficient to
support Robinson's conviction.

 "In assessing the legal sufficiency of the evidence to support a criminal conviction,
we consider all the evidence in the light most favorable to the verdict and determine whether,
based on that evidence and reasonable inferences therefrom, a rational juror could have found
the essential elements of the crime beyond a reasonable doubt." Hooper v. State, 214 S.W.3d
9, 13 (Tex. Crim. App. 2007) (citing Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct.
2781, 61 L.Ed.2d 560 (1979)). A person commits robbery if, in the course of committing a
theft and with the intent to obtain or maintain control of the property, the person causes
bodily injury to another or the person threatens or places another in fear of imminent bodily
injury or death. See Tex. Pen. Code Ann. § 29.02 (Vernon 2003). 

 In 2007, the Texas Court of Criminal Appeals considered a case in which items of the
murder victim's property were found to be missing when the victim's body was discovered.
Roberts, 220 S.W.3d at 525-26. Noting that investigators determined the appellant possessed
those items on the day of the murder or the next day, the Roberts Court concluded that the
"jury could have inferred that appellant took these items shortly after the murder. And from
that conclusion, the jury could have further inferred that the murder was committed during
the course of a robbery." Id. (citing Cooper v. State, 67 S.W.3d 221, 224 (Tex. Crim. App.
2002)); see Poncio v. State, 185 S.W.3d 904, 905 (Tex. Crim. App. 2006) (stating that
unexplained possession of property recently stolen in a robbery permits an inference that the
defendant is the one who committed the robbery). 

 In support of his argument, Robinson refers to Ranger Huff's testimony about
Daniel's wallet and cash. When asked on cross-examination whether there was any 
indication that Daniel's wallet had been rifled through, Ranger Huff replied: "Not the wallet,
no, sir." When asked whether there was any indication that Daniel had cash on him, Huff
replied: "There's no indications from what we observed at the scene." On the other hand,
the State argues that there is ample evidence to support a finding that robbery was committed
or attempted during the course of Daniel's murder and that Robinson killed Daniel in order
to steal his 1978 Chevy Nova, cash money, and crack cocaine.

 This case is similar to Roberts. See 220 S.W.3d at 524 (Examination of the scene
revealed a missing truck; locating the truck led police to appellant.). In this case, at the time
Daniel's body was discovered, Daniel's wife noticed that his car was missing. Upon their
arrival at the scene, investigators started trying to locate the missing Chevy Nova. They
found the Nova at Hilton's Grocery, and, with the cooperation of the Bests, determined that
Robinson had the car on the night of September 9 and on the following morning. Based on
the evidence related to the Nova, the jury reasonably could have inferred that Robinson took
the Nova shortly after the murder, and from that conclusion, the jury could have further
inferred that Daniel's murder was committed during the course of a robbery. See id. at 525-26. Issue three is overruled. 

 Having considered and overruled all of Robinson's issues, we affirm the trial court's
judgment.

 AFFIRMED.

 _________________________________

 HOLLIS HORTON

 Justice

Submitted on August 19, 2009

Opinion Delivered December 30, 2009

Do Not Publish


Before McKeithen, C.J., Kreger and Horton, JJ.
1. Section 12.31 of the Texas Penal Code establishes the punishments for capital
felonies. Tex. Pen. Code Ann. § 12.31 (Vernon Supp. 2009). In 2004, when Tebo was
murdered, section 12.31 provided, in pertinent part, for a penalty of life imprisonment when
an individual was found guilty of a capital felony in a case in which the State did not seek
the death penalty. See Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 1.01, sec. 12.31, 1993
Tex. Gen. Laws 3586, 3602-03, amended by Act of May 28, 2005, 79th Leg., R.S., ch. 787,
§ 5, 2005 Tex. Gen. Law 2705 (providing for life imprisonment without parole).