Affirmed and Memorandum Opinion filed July 1, 2008








Affirmed and Memorandum Opinion filed July 1, 2008.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00798-CR

NO. 14-06-00799-CR

____________

 

OSCAR GUTIERREZ, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 185th
District Court

Harris County, Texas

Trial Court Cause Nos. 1038933
&1038934

 



 

M E M O R A N D U M   O P I N I O N

Appellant Oscar Gutierrez was tried and found guilty by a
jury of the felony offenses of aggravated sexual assault of a child and
indecency with a child.  The jury assessed punishment at five years= confinement in
the Texas Department of Criminal Justice, Institutional Division, and a $10,000
fine for the aggravated sexual assault conviction, and ten years= probation and a
$10,000 fine for the indecency with a child conviction.  In four issues,
appellant challenges the legal and factual sufficiency of the evidence
supporting the jury=s verdicts.  We affirm.








Factual
Background

In May 2005, D.C., the complainant, who was eight years old
and in the third grade, was at school talking to her friend R.F. in the back of
the classroom, when R.F. began telling D.C. about some bad things that had
happened to her.  D.C. started crying and told R.F. about similar things that
had happened to her, but R.F. thought that what D.C. described was  Aa lot worse@ than what had
happened to her.  R.F. went home and told her mother about what D.C. had said. 
R.F.=s mother reported
the conversation to the school nurse, Debra Harris, who then spoke with R.F.
and D.C.[1] 
Harris learned from D.C. that the adult she made the allegations against was
her grandfather, but Harris did not determine whether it was the maternal or
paternal grandfather.  She did not feel that it was her place to investigate
further, because she already had enough information to make a report to
Children=s Protective
Services (ACPS@). 

Officer Kim Barnes of the Houston Police Department was
assigned to investigate Harris=s report.  Officer Barnes reviewed the
videotape of D.C.=s interview with Susan Odhiambo, a
forensic interviewer at the Children=s Assessment
Center (ACAC@), and learned the
details of the sexual abuse D.C. alleged.  She then contacted and obtained
statements from witnesses.  She also attempted to contact appellant, but her
calls were not returned.  Through her investigation, she determined that the
offenses against D.C. were committed at 1433 West 23rd Street in Harris County,
Texas, appellant=s home. 








During Odhiambo=s interview, D.C.
revealed that she had been sexually abused numerous times.  D.C. stated that
she was first abused around the age of seven or eight, and that the abuse
continued until around April of 2004.  D.C. stated that appellant touched her
on her chest, her Abutterfly,@ and her bottom. 
D.C. also stated that appellant touched her both over and under her clothes
with his hands and mouth.  Specifically, he would rub her Abutterfly part@ and squeeze her
bottom with his hand, suck on her chest with his mouth, and lick on her Abutterfly@ with his tongue. 
Appellant showed her his Aprivate part@ or penis, which
D.C. described as a pink oval that would Aspit.@  Appellant made
her touch his penis, and she described it as feeling like Aone of those toys
that had jelly in it@ that when touched felt like it was Agoing to come out
of your hand or fall out of your hand.@  D.C. said that
these acts occurred at her grandfather=s home, and that
the man who did this was her Amother=s dad@ and his name was AOscar.@ 

During cross-examination at trial, Odhiambo confirmed that
D.C. talked about going to a store in the mall, which D.C. called Athe nasty store,@ where she saw
cards with pictures of women showing parts of their bodies.  However, Odhiambo
did not ask D.C. follow-up questions about this event.  When asked if D.C. had
ever referred to the person who touched her as AImpa,@ Odhiambo said
D.C. did not call him that and she had not heard that term before.

At trial, D.C.=s father, Edwin
Chavez, testified that his family was very close to appellant, and that
appellant was always there to help them if they needed it.[2] 
D.C. and her younger sister would regularly stay at appellant=s home on West
23rd Street.  After the report was made to CPS about D.C., a CPS caseworker
contacted Chavez and he learned that his children were in CPS custody regarding
a sexual abuse allegation.  At the time, Chavez testified that he was afraid
that he might not get his daughters back right away.  Once he arrived at CPS,
he saw D.C., who apologized to him for not telling him earlier about the
abuse.  

Chavez also testified about changes in D.C.=s behavior, which
began around the age of seven or eight, such as nightmares, overeating, not
sleeping, crying spells, and falling grades at school.  He took D.C. to a
therapist, Dr. Sendukas.  Once she started therapy, D.C.=s behavior
improved, she stopped overeating, and she would sleep better.








Chavez testified that D.C. had been with him when the
family went to a Spencer=s store at the mall, where, in one section
of the store, cards, games, and toys of a sexual nature are sold.  He testified
that he did not allow D.C. in that section of the store, but admitted it was
possible she might be aware of the nature of some of the items.  He also
testified that both he and his wife were responsible for disciplining D.C. and
her younger sister, J.C., and that the discipline sometimes included spanking.[3] 
Chavez also testified that his parents were very protective of the girls, and
his father had expressed concern about D.C. spending time with the appellant
because he was not her biological grandfather. 

On cross-examination, Chavez testified that two or three
years earlier, his twenty-six or twenty-seven-year-old cousin stayed at their
apartment, and he slept in the same bedroom as D.C.  Chavez admitted that, for
unspecified reasons, he became very mad at his cousin and told him to get out,
and that D.C. witnessed this event and it caused her to cry.  However, on
redirect, he also testified that the reason his cousin moved out had nothing to
do with D.C., and Chavez did not suspect his cousin of any inappropriate
contact with D.C.  Chavez also testified that his father was a massage
therapist, and he sometimes sees clients in his two-bedroom apartment.  He also
testified that, when D.C. would stay with his parents, D.C. would sleep in the
bed with his mother, and his father would sometimes also sleep with them or he
would sleep on the floor in the living room.

Dr. Froso Sendukas, a psychotherapist for thirty-two years,
testified that she provided six therapy sessions for D.C. and her family.  She
helped D.C. address the drop in her grades, nightmares, crying spells, and
bouts of irritability.  During the counseling sessions, D.C. consistently
described who sexually abused her.  Without hesitation, she referred to the
perpetrator as AImpa@ and described him
as her Agrandfather from
her mother=s side.@  








D.C. testified that appellant, whom she identified in
court, abused her on numerous occasions.  She testified that his name was Oscar
Gutierrez, he was her grandfather on her mother=s side, and she
called him AImpa.@  She stated that since she was eight
years old, appellant abused her at his home, and she identified a photograph of
appellant=s home as the place where she was abused.  D.C.
testified that appellant would touch her chest, Aprivate,@ and bottom with
his hands both over and under her clothing.  As he touched her he would say
things to her such as Aoh, yeah@ and Aoh, baby.@  He also placed
his mouth on her vagina several times, licking her Aprivate@ with his tongue. 
Appellant also would pull his pants down and touch his Aprivate@ to her Aprivate,@ and she was able
to describe his private as being pink and a Areally skinny
oval.@  Appellant made
D.C. touch his penis with her hand, and she described his penis as being Asoft and spongy.@  Additionally,
she stated that once, while in the bathroom at his home, he was Asqueezing his
private with his hand@ until Awhite vomit@ came out of it. 
While appellant was doing that he made D.C. pull down her pants and bend over. 
She testified that appellant told her it was Aspit,@ and that he
flushed it down the toilet.

D.C. testified that the acts would occur in one of the
bedrooms or in the bathroom, and that appellant and his wife did not usually
sleep in the same room.  She also said that these incidents would occur when
her grandmother was not in the room because she was either in another room or
outside.  D.C. also testified that she told her grandmother, appellant=s wife, about what
appellant was doing to her, and her grandmother told her that if she told her
again then D.C. would not be able to stay at their home anymore.  Appellant
also told D.C. not to tell anybody, and after D.C. told her grandmother,
appellant told D.C. not to tell anybody ever again.  D.C. did not tell her mom
or dad, because she was afraid that her dad might punish or hit her.  








On cross-examination, D.C. agreed that she had always
called appellant AImpa@ and referred to
her father=s parents as AGrandpa@ and AGrandma.@  She also
testified that when she stayed at her father=s parents= house, she slept
in the same room with them, but on a separate mattress or on the floor.  On
redirect, D.C. testified that although she called appellant AImpa,@ when she told
R.F. what had happened to her, she referred to him as her grandfather.  When
asked by the prosecutor if it was possible she was mistaken about who abused
her, D.C. also specifically stated, AI=m positive that it=s this man that I=m talking about.@  She also
confirmed that every time she told someone that her grandfather did these
things to her, she was talking about appellant.  

After D.C.=s testimony, the State rested, and
appellant presented his case-in-chief.  Appellant first called his wife, Maria
Gutierrez.  Gutierrez testified that if D.C. had told her about the abuse she
would have believed her because Ano child would lie@ about sexual
abuse.  She acknowledged that D.C. would sometimes sleep alone with appellant,
and that she and appellant slept in different bedrooms.  When asked if she now
believed appellant abused D.C., she testified, AWhat I don=t believe is that
she said she told me and she never told me anything.@

The defense then called Mario Chavez, D.C.=s paternal
grandfather.  He testified that D.C. and her sister would sometimes spend the
night at he and his wife=s two-bedroom apartment.  When asked
whether they all slept in the same bedroom, he answered Ano,@ but upon further
questioning, he testified that the girls would sleep with his wife, and he
would sleep either on the floor of the bedroom or in the other bedroom.  On
cross-examination, Chavez denied ever exposing himself to or having any
inappropriate contact with D.C.  He confirmed that he told his son, Edwin, D.C.=s father, that he
was concerned about the girls going over to appellant=s house because he
was not biologically related to them.  On redirect, Chavez explained that he
was not warning his son about a Asexual aspect,@ but rather about
the girls= education and moral upbringing.

The defense also called Blanca Olivia Chavez, Mario Chavez=s wife and the
paternal grandmother of D.C.  She testified that D.C. would spend the night with
her and her husband from time to time and that they slept in the same room. 
She also testified that she did not hear D.C. refer to appellant as anything
other than AImpa.@  








Appellant also testified in his defense.  He testified that
he believes that D.C. was abused; however, he denied that he sexually abused
her.  He also testified that D.C. has always called him AImpa,@ and has never
called him Agrandfather@ or Astep-grandfather.@  On
cross-examination, appellant admitted that he noticed the changes in D.C.=s behavior when
she would visit him.  He confirmed that he was her step-grandfather on her
mother=s side.  He also
confirmed that there were times he and D.C. would sleep in bed together with no
one else around. 

Joe Gutierrez, appellant=s older brother,
testified that his children and grandchildren had spent time in the past,
including time overnight, with appellant.  He also testified that he knew
appellant to be truthful and had never known him to lie.  However, he did not
know anything about the allegations D.C. made against appellant.

John Tinkle, appellant=s employer, also
testified that appellant was a truthful person and had never lied to him about
anything.  However, all he knew about the allegations against appellant was
what appellant had told him, which was that he was accused of inappropriate
activity with his granddaughter.  He had no personal knowledge about whether or
not the allegations were true.

Analysis

In four issues, appellant challenges the legal and factual
sufficiency of the evidence supporting the jury=s findings that he
was guilty of aggravated sexual assault of a child and indecency with a child. 
Specifically, appellant contends D.C.=s testimony was
not credible and the remaining evidence shows that someone else, possibly D.C.=s paternal
grandfather, Mario Chavez, or D.C.=s
twenty-six-year-old cousin, actually committed the offenses.








I.        The Legal
Sufficiency of the Evidence

A.      Standard of
Review

Evidence is legally sufficient if, when viewed in a light
most favorable to the verdict, a rational jury could have found each element of
the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S.
307, 319 (1979); Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App.
1996).  The jury is the exclusive judge of the credibility of witnesses and of
the weight to be given testimony, and it is also the exclusive province of the
jury to reconcile conflicts in the evidence.  Jones, 944 S.W.2d at 647. 
Thus, when performing a legal-sufficiency review, we may not re-evaluate the
weight and credibility of the evidence and substitute our judgment for that of
the fact-finder.  Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App.
1999).  We must resolve any inconsistencies in the testimony in favor of the
verdict.  Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

B.      Analysis of
the Legal Sufficiency of the Evidence

According to appellant, the only evidence that would
support the jury=s verdicts is D.C.=s testimony, but a
review of the remaining evidence shows that her testimony that he committed the
offenses was not credible.  However, viewing the evidence in the light most
favorable to the prosecution, a rational trier of fact could have found that
appellant committed these offenses beyond a reasonable doubt.  As the exclusive
judge of the facts and the credibility of the witnesses, the jury decided they
believed D.C. beyond a reasonable doubt.  She testified that appellant, also
known to her as AImpa,@ her
step-grandfather, her grandfather on her mother=s side, and AOscar,@ committed the
sexual acts against her.  The jury heard testimony from appellant and his
witnesses, and it chose to disbelieve appellant=s version, which
was that someone elseCD.C.=s other
grandfather or her cousinCcommitted the offenses.  








Although there were some conflicts in the testimony during
trial, the jury resolved those conflicts in favor of the State, and, reviewing
D.C.=s testimony and
the testimony of the other witnesses in the light most favorable to the
prosecution, the jury acted as a rational trier of fact in finding appellant
guilty of both offenses beyond a reasonable doubt.  We therefore overrule his first
and second issues.

II.       The
Factual Sufficiency of the Evidence

A.      Standard of
Review

When reviewing the factual sufficiency of the evidence to
support a conviction, we review all the evidence in a neutral light, favoring
neither party.  Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim. App.
2007); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). 
Evidence may be factually insufficient in one of two ways: (1) when the
evidence supporting the verdict is so weak that the verdict seems clearly wrong
and manifestly unjust, and (2) when the supporting evidence is outweighed by
the great weight and preponderance of the contrary evidence so as to render the
verdict clearly wrong and manifestly unjust.  Roberts, 220 S.W.3d at
524; Watson, 204 S.W.3d at 414B15; Johnson v.
State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  An appellate court judge
cannot conclude that a conviction is Aclearly wrong@ or Amanifestly unjust@ simply because,
on the quantum of evidence admitted, she would have voted to acquit had she
been on the jury.  Watson, 204 S.W.3d at 417.  Nor can an appellate
court declare that a conflict in the evidence justifies a new trial simply
because it disagrees with the jury=s resolution of
that conflict.  Id.  Additionally, we give due deference to the jury=s determinations,
particularly those concerning the weight of the evidence and the credibility of
witness testimony.  See Roberts, 220 S.W.3d at 524; Johnson, 23
S.W.3d at 8B9.

B.      Analysis of
the Factual Sufficiency of the Evidence








According to appellant, D.C.=s testimony was
not credible in light of other evidence that appellant was not guilty. 
Specifically, appellant points to evidence that although D.C. always called him
AImpa,@ when she told
R.F. and Odhiambo who had abused her, she did not call the alleged abuser AImpa,@ but rather
referred to her Agrandfather@ as the
perpetrator.  Appellant also contends the evidence showed that D.C. was afraid
of her father and so named appellant rather than her paternal grandfather,
Mario Chavez, as her abuser because she was afraid her father would punish her.[4] 
Appellant also claims Mario Chavez, as a massage therapist who Atouches bodies@ for a living, had
the opportunity to commit the offenses.  Appellant contends that the evidence
also shows that the layout of his home and Mario Chavez=s home were
similar, except that the kitchen was actually closer to the bedroom in
appellant=s home, so that if something were happening in the
bedroom of appellant=s home, appellant=s wife would have
been able to hear it from the kitchen.  Appellant further asserts that it was
suspicious that Mario Chavez Aforewarned@ D.C.=s father that
appellant might abuse D.C. because she was not a blood relative, when, in
contrast, appellant had never done anything to indicate that he was a sexual
abuser.  Appellant also contends that Mario Chavez lied to the jury by
testifying, contrary to his wife and D.C., that he never slept in the same bedroom
as D.C. when D.C. spent the night at his home.

Additionally, appellant points to evidence that he had no
magazines, cable television, or other means by which D.C. could have been
exposed to sexual acts, while in contrast, D.C.=s parents allowed
her to be exposed to Anasty@ pictures and
other sexually-oriented items at a store in the mall.  Further, appellant
places great emphasis on the testimony of his wife, Maria Gutierrez, who denied
that D.C. ever told her that any inappropriate acts were going on and told the
jury that, had D.C. told her, she would have immediately called the police.  








Thus, although appellant concedes A[i]t was clear
from the testimony of the detailed acts that the commission of this offense was
committed by someone against the complainant,@ the evidence
shows that Athe more appropriate person@ to have committed
these acts would have been D.C.=s paternal grandfather, Mario Chavez. 
Alternatively, appellant contends that D.C.=s cousin could
have been her abuser because he was permitted to stay in the same bedroom with
D.C.  In support of this alternative theory, appellant points to Edwin Chavez=s testimony that
when he was contacted by CPS, he feared CPS would take his children away from
him, and suggests that Edwin Chavez feared his children would be taken away
because he had put them in a Adangerous situation@ with the cousin. 
Based on the above evidence, appellant contends that the evidence was
overwhelming that he did not commit the offenses, but that someone else did. 
However, we disagree with appellant=s characterization
of the evidence and the weight the jury properly could have assigned to it.

D.C. consistently identified appellant as the person who
had abused her.  Even though the record contains conflicting testimony between
appellant and D.C., the evidence, when viewed in a neutral light, is factually
sufficient to support the jury=s verdicts.  

First, the State=s case was not too
weak to support the jury=s verdicts.  The State called several
witnesses to testify.  Regarding D.C.=s initial outcry
of sexual abuse, the State called R.F., a child.  R.F. testified that her
recounting of what had happened to her caused D.C. to cry, and when R.F. asked
her to tell her what was wrong, D.C. told R.F. what had happened to her.  R.F.
stated that what D.C. told her was Aa lot worse@ than was had
happened to R.F.  Although D.C. did not tell her which specific grandfather did
something to her, she did tell R.F. that the person who abused her was her
grandfather.  She did not accuse her cousin of the abuse, and there is
absolutely no evidence in the record that the cousin could have been her
abuser.  Further, D.C. testified that, although she called appellant AImpa,@ she called him
her grandfather when she was talking to R.F.








Debra Harris, the school nurse, testified about how the
sexual abuse was brought to the attention of the authorities.  She spoke with
R.F. and R.F.=s mother, and after she was able to locate D.C., she
made a report to CPS.  Harris explained that she did not go into detail
regarding the abuse with D.C., and so did not confirm which grandfather had
abused D.C., but she was able to confirm that D.C. had made an allegation of
sexual abuse against a grandfather.  Again, there was never any mention of a
twenty-six-year-old cousin during Harris=s conversation
with D.C. 

Susan Odhiambo interviewed D.C. about what had happened to
her, and D.C. was very descriptive about the sexual acts.  She described
repeated sexual abuse by appellant.  So credible was her testimony that
appellant himself conceded during his testimony that he believed D.C. had been
sexually abused.  Similarly, appellant=s counsel on
appeal also concedes that she was sexually abused.[5] 
The only issue appellant believes her to be lying about is the identity of the
person who committed the acts.  However, during the interview with Odhiambo,
D.C. clearly stated who committed these acts against her.  She told Odhiambo
that they happened at her grandfather=s house, that the
grandfather was Aher mother=s dad,@ and that his name
was AOscar.@  This specific
description provided the location of appellant=s home, a
description of how appellant was related to her, and appellant=s first name.








At trial and on appeal, appellant points to D.C.=s other
grandfather as the one who abused D.C.; however, her other grandfather is her
paternal grandfather and is named AMario.@  Mario Chavez
testified at trial and denied any inappropriate touching of D.C., and at no
point during the investigation or trial did D.C. ever state or even imply Mario
Chavez abused her.  Additionally, appellant=s claim that Mario
Chavez=s testimony is
suspect because he allegedly lied to the jury when he denied ever sleeping in
the same room with D.C. is not supported by the evidence.  Although Chavez
initially answered Ano@ when asked, ADid y=all sleep in the
same bedroom?@ when D.C. and her sister would spend the night,
Chavez testified in response to further questioning that the girls would sleep
in the same bedroom with his wife, and that  he would sometimes sleep on the
floor in the same bedroom or in the other bedroom.  Also contrary to appellant=s assertion, Mario
Chavez did not testify that he warned D.C.=s father that
appellant might sexually abuse D.C. or her sister because they were not blood
relatives; instead, he testified that his concern was directed to the girls= upbringing. 
Further, there is nothing in the record to support appellant=s suggestion on
appeal that, because Mario Chavez was a massage therapist, he would be likely
to commit sexual abuse of a child.  

Appellant also contends that the abuse could not have
happened as D.C. testified, because the bedroom of appellant=s house was close
to the kitchenCso that appellant=s wife would have
heard anything happening in the bedroomCand therefore it
was more likely that the abuse actually took place in the paternal grandfather=s house, where the
kitchen was not as close to the bedroom.  However, contrary to appellant=s claim, D.C. did
not testify that appellant=s wife was always in the kitchen when the
abuse occurred.  For example, D.C. testified that the first time appellant
touched her inappropriately, it was in bed in the middle of the night at
appellant=s house, and appellant=s wife was in the
other bedroom.  Later during her testimony, when D.C. was asked where her
grandmother was when appellant was in the bedroom abusing her, she said, AProbably in the
other room or in another room, like, in the kitchen or dining room or outside.@  D.C. also
testified that the abuse always happened at appellant=s house, and it
sometimes occurred in one bedroom and sometimes in the other bedroom.  A
decision is not manifestly unjust merely because the jury resolved conflicting
views of the evidence in favor of the State.  Cain v. State, 958 S.W.2d
404, 410 (Tex. Crim. App. 1997).  

Dr. Sendukas testified that during their sessions, D.C.
referred to the man who sexually abused her as both AImpa@ and her Agrandfather from
her mother=s side.@  She also
established that, during these sessions, D.C. was consistent about appellant
sexually abusing her and never hesitated in stating who had abused her.  This
evidence contradicts appellant=s assertion that D.C. never implicated her
AImpa@ as her abuser.








D.C. was ten years old when she testified at trial.  She
clearly described numerous occasions of sexual abuse committed against her,
including the touching of her breast, private, and bottom.  She testified that
appellant touched her both over and under her clothes with his hand, and that
he said things like Aoh, yeah@ and Aoh, baby.@  She also
testified that appellant placed his mouth on her breast and her vagina, and
made her bend over while exposed so he could look at her while he masturbated. 
He also pulled down his pants and placed his Aprivate@ to her Aprivate,@ and made her
place her hand on his penis.  D.C. identified appellant in court as the man who
committed these acts against her.  She testified that her step-grandfather=s name was Oscar
Gutierrez, but she called him AImpa.@  During the
trial, she pointed to appellant and identified him as being her
step-grandfather, Oscar Gutierrez.  After discussing the places on her body
that one should not touch, she was asked:

Q:      [State] Now, [D.C.], has anybody ever
touched you on any of those places that you didn=t like?

A:      [D.C.] Yes.

Q:      Who?

A:      Him.

Q:      When you say Ahim,@ how do you know him?

A:      That is my grandfather on my mother=s side.

Q:      Your grandfather on your mother=s side?  Is that the person you
identified earlier as the defendant?

A:      Yes.

Based
on D.C.=s testimony, her
prior statements, and the testimony of other witnesses who corroborated her
statements, the State=s evidence was not too weak to justify a
finding of guilt beyond a reasonable doubt.








As discussed above, evidence can also be held to be
factually insufficient if there is conflicting evidence, and the great weight
and preponderance of the evidence contradicts the jury=s verdict.  See
Watson, 204 S.W.3d at 417.  Appellant contends that D.C. was really abused
by her paternal grandfather, but was too fearful of her father to say so, and
instead falsely accused appellant.  However, the record does not support the
claim that D.C.=s fear was so great that she would falsely
accuse appellant.  During D.C.=s testimony, she stated that she was
afraid to tell her father, Edwin Chavez, that appellant had abused her because
she was scared he may Apunish her or something.@  When questioned
about what type of punishment she feared, she explained, Ahe=ll probably just
talk to me or, like, if it was really bad or if I=ve done it twice,
he might, like hit me with the belt.@  When asked how
often she got punished with a belt, she said Ajust a little.@  Additionally,
the testimony at trial from both D.C.=s father and
appellant established that appellant helped D.C.=s family as much
as her other grandparents.  There was no evidence that D.C. believed that her
father would be mad at her for accusing one grandfather over the other.  

Likewise, there was no evidence that D.C. believed her
father would be angry if she accused her cousin of abusing her.  Although the
evidence showed that Edwin Chavez argued with his cousin and told him to get
out of his house, and that this exchange made D.C. cry, there was no testimony
that the reason D.C.=s father was angry with his cousin had
anything to do with D.C.  Further, Dr. Sendukas testified that D.C. told her
that the reason she did not tell anyone else that she had been abused was that
she had tried to tell her grandmother, appellant=s wife, but her
grandmother did not believe her, and so D.C. was afraid that her parents also
would not believe her. 

Appellant also points to the testimony of his wife, Maria
Gutierrez, as evidence that D.C. is lying about who sexually abused her.  Mrs.
Gutierrez testified that D.C. never told her of any sexual abuse allegations. 
However, D.C. testified that she did tell Mrs. Gutierrez about the abuse, and
that Mrs. Gutierrez told D.C. that if she told her again about the allegations,
D.C. would not be able to come back to the house.  D.C. also told Susan
Odhiambo during the interview that she had told her grandmother about the
abuse.  The jury was free to believe that appellant=s wife was not
being truthful when she testified that D.C. had not told her about the abuse,
and the jury also was free to believe that D.C. was being truthful when she
told Odhiambo and Dr. Sendukas that she did tell appellant=s wife about the
abuse, and also testified that she did so. 








Thus, viewing the record in a neutral light, we conclude
that the evidence supporting the verdicts is not so weak that the verdicts seem
clearly wrong and manifestly unjust, nor was the supporting evidence outweighed
by the great weight and preponderance of the contrary evidence so as to render
the verdicts clearly wrong and manifestly unjust.  See Roberts, 220
S.W.3d at 524.  We therefore overrule appellant=s third and fourth
issues.

Conclusion

We overrule appellant=s issues and
affirm the trial court=s judgment.

 

 

/s/      Wanda McKee Fowler

Justice

 

 

 

 

Judgment rendered
and Memorandum Opinion filed July 1, 2008.

Panel consists of
Justices Fowler, Frost, and Seymore.

Do Not Publish C Tex. R. App. P. 47.2(b).

 

 









[1]  The details of R.F.=s and D.C.=s conversations with each other or with Harris were
not delved into at trial.





[2]  D.C.=s mother did
not testify at trial.





[3]  During Odhiambo=s
testimony, defense counsel asked whether D.C. had indicated to her that her dad
would take out his belt and threaten her with it when she got into trouble at
home or if she was afraid of her dad=s
belt, but Odhiambo would confirm only that she and D.C. had talked about D.C.=s dad=s belt and that
he was wearing it that day.





[4]  Specifically, appellant characterized the evidence
as showing that D.C. was fearful of her father because Ashe had observed his treatment of his cousin when
something occurred that the father did not like@ and she was also fearful of her father=s belt as punishment because Ashe
did not believe that he would believe her and would feel like it was her fault
that these acts had been committed.@





[5]  Consequently, appellant=s arguments concerning sexually-oriented items at a store or depictions
of sexual matters D.C. may have seen as a source of her testimony are
irrelevant.