# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00695-CR

**Jeffrey Michael Wahlig, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT
### NO. CR-06-191, HONORABLE DIB WALDRIP, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Jeffrey Michael Wahlig of the offenses of burglary of a habitation, aggravated assault, and two counts of endangering a child. *See* Tex. Penal Code Ann. §§ 22.02(b)(1), .041(c) (West Supp. 2008), § 30.02(a)(3) (West 2003). He was sentenced to twelve years in prison. Wahlig appeals, asserting a double-jeopardy violation and challenging the sufficiency of the evidence to support the convictions for child endangerment.[1] We affirm the child endangerment convictions.

Jeffrey Michael Wahlig and his wife, Rebecca, had been having marital difficulties before the incident in question. Rebecca admitted to Wahlig that she had been having an affair with an old friend, Eric Sharp. At the time of the incident, the status of the relationship between

---

[1] The State concedes the double jeopardy violation. Accordingly, we reverse the conviction for burglary and dismiss the prosecution on that count.

Wahlig and Rebecca was unclear. Wahlig testified that they were trying to work through their problems. Rebecca testified that they were making arrangements to separate and divorce. Both Wahlig and Rebecca agree, however, that Rebecca had promised not to see Sharp. On February 14, 2006, Rebecca "broke down" and met Sharp at the home of her sister around lunch time. Wahlig testified that he went to Rebecca's work place to take her out to lunch for Valentine's Day. He was informed that she had gone out for a while, so according to Wahlig, he headed back to work. On the way back, he drove by Rebecca's sister's house, where he noticed her van and another vehicle parked outside. Suspecting that Rebecca was with Sharp, he began knocking, kicking, and pounding on both the front and back doors. Eventually, while Wahlig was in the front of the house, Sharp fled through the back door. When Rebecca went to close the garage door, she was confronted by Wahlig, who hit and kicked her repeatedly. After the assault, Wahlig gave Rebecca a towel and left.

Wahlig then drove to his daughters' school and picked up the girls because, according to Wahlig, he knew that "eventually the police probably would come for me . . . and I just wanted to be with them and say goodbye." He returned with the girls to his house, "[p]ut a movie in, took off their shoes and socks, gave them a little snack and put them in front of the TV and—just got them comfortable." Shortly thereafter, police arrived at the house and began knocking on the door. However, Wahlig refused to let them in, explaining that "I wanted to get in touch with my mom to let her know what's going on and my friends so they can make arrangements to possibly bail me out." He also testified that he was "trying to gather up enough stuff for the girls so that they can be prepared on whatever they're going to do. I tried to prepare them on what they're going to do to me and just so they're a little aware of what's going on." Wahlig also testified that, in the process

2

of gathering some things for the girls, he "found some left over articles of lingerie that my wife wore for [Sharp]." Wahlig put Rebecca's things in several piles and went downstairs to get lighter fluid. On his way back upstairs, he brought the girls with him and had them sit down on the top of the stairs. He set the clothes on fire, escorted the girls with their things downstairs, and surrendered to the police.

In four counts, Wahlig was indicted for burglary of a habitation, aggravated assault, and two counts of endangering a child. A jury convicted Wahlig on all four counts and sentenced him to ten years for burglary, twelve years for aggravated assault, and two years for both counts of child endangerment. All sentences were to run concurrently. Wahlig appeals, arguing that he was subjected to multiple punishment for the same criminal transaction in violation of his double-jeopardy rights and that the evidence was insufficient to support conviction on the two counts of child endangerment.

The State concedes that the judgment sentencing Wahlig for both burglary of a habitation and aggravated assault, a lesser-included offense of burglary of a habitation, violated double jeopardy by subjecting him to two punishments for the same criminal transaction. *See, e.g.*, *Berger v. State*, 104 S.W.3d 199, 204-05 (Tex. App.—Austin 2003, no pet.) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)) (two offenses are same for double-jeopardy purposes if one of offenses contains all elements of other). The remaining dispute is limited to the proper remedy for the double-jeopardy violation. The parties agree that this Court is required to vacate the conviction for the lesser offense, but disagree as to the method by which we are to determine which offense is the lesser. *See Landers v. State*, 957 S.W.2d 558, 559 (Tex. Crim. App. 1997) (citing *Ball*

3

*v. United States*, 470 U.S. 856, 864-65 (1985)).  Relying on *Ex parte Cavazos*, 203 S.W.3d 333 (Tex. Crim. App. 2006), the State contends that the most serious offense is to be determined by the sentence assessed by the fact-finder.  While acknowledging the court's decision in *Cavazos*, Wahlig contends that the method espoused by *Cavazos* is constitutionally flawed and, to that extent, should not be followed.

In 2006, the Texas Court of Criminal Appeals clarified the "most serious offense test" originally set out in *Landers*.

> [T]he "most serious" offense is the offense of conviction for which the greatest sentence was assessed.  To the extent that *Landers* holds that other factors, such as the degree of the felony, range of punishment, and rules governing parole eligibility and awarding of good-conduct time, shall be used in that determination, it is overruled.

*Cavazos*, 203 S.W.3d at 338; *see Landers*, 957 S.W.2d at 559.[2]

Wahlig contends that the test set out by the court in *Cavazos* is flawed because it impermissibly usurps the role of the legislature in determining which are the greater offenses and which are the lesser offenses.  According to Wahlig:

> In the absence of Legislative action, the rule of law should define greater and lesser offenses, not the verdict of any given jury in any given trial. . . .  The primary problem with the *Cavazos* opinion is that it hands over to juries the Legislative power to decide which offense is greater than another.  Secondarily, the *Cavazos* opinion is unworkable because it presupposes that any given jury is acting rationally in

---

[2]  The "other factors" mentioned in *Cavazos* remain important in determining the most serious offense when the sentences are the same.  *See Bigon v. State*, 252 S.W.3d 360, 373 (Tex. Crim. App. 2008).

determining sentence when the only thing we know for sure is that the jury has been given erroneous legal instructions from the trial court.

The State asserts that, in compliance with the rule set out in *Cavazos*, Wahlig's conviction for burglary of a habitation should be reversed, and the conviction for aggravated assault should stand. We agree with the State's assessment of the state of the current law and are required to follow precedent established by the Texas Court of Criminal Appeals in *Cavazos*. Accordingly, we sustain Wahlig's first point of error and reverse the judgment of conviction for burglary of a habitation.

In his second and third points of error, Wahlig argues that the evidence is legally and factually insufficient to support his convictions for child endangerment. The jury found, as alleged in the indictment, that Wahlig endangered his children "by igniting multiple areas of a second story habitation" while his children were inside. Wahlig challenges the sufficiency of the evidence to support this finding.

In a legal-sufficiency review, we consider whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *See Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007); *Shams v. State*, 195 S.W.3d 346, 347 (Tex. App.—Austin 2006, pet. ref'd) (citing *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981)).

In a factual-sufficiency review, the evidence is reviewed in a neutral light. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007). Evidence is factually insufficient (1) when the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust; or (2) when the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust. *Id.* An appellate court must be appropriately deferential to the jury's verdict, in order to avoid substituting its own judgment for that of the fact-finder. *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). We may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).

A person commits an offense of child endangerment if he:

> intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment.

Tex. Penal Code Ann. § 22.041(c). To be imminent, the conduct must be:

> ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near. It is not sufficient that the accused placed the child in a situation that is potentially dangerous. The accused's conduct must threaten the child with immediate, impending death, bodily injury, or impairment.

*Millslagle v. State*, 81 S.W.3d 895, 898 (Tex. App.—Austin 2002, pet. ref'd).

The record includes evidence that, while the children were waiting at the top of the stairs, Wahlig set fire to three or four different locations inside the master bedroom, which was also located upstairs. The record shows that Officer Patsy Oaks was the first to arrive at

6

Wahlig's residence. Oaks testified that upon entering the house, she smelled something burning and that "it was hazy" and "smoky looking." The girls were "upset and crying." When Oaks took the girls outside, she could see flames coming from the roof of the house. Fearing for the safety of the children, Oaks took them about 15 to 20 feet from the house. When Oaks again looked at the house, she saw "a lot more smoke and flames."

The jury also heard the testimony of William Montague, the assistant fire marshal, who told the jury that, based on his observation of black soot around the air conditioning vent, the air conditioning system was on and "sucking smoke into the air ducts and blowing it out the vents into each room." According to Montague, this would create "very dangerous" conditions because smoke and carbon monoxide would be blown into every room in the house. Montague also explained that carbon monoxide is particularly dangerous to children because "[t]hey're a lot smaller than adults, so their systems react a lot faster."

According to Wahlig, "[t]he children were never close enough to the fire to be able to observe it while they were inside the house," and expert testimony given by the assistant fire marshal as to imminent danger from carbon monoxide was insufficient to establish whether the fire had created enough carbon monoxide to pose an actual danger to the children. Because "[a]ll evidence points to their [the children's] expeditious removal from the house immediately after the blaze was set," Wahlig contends, the evidence is insufficient to support a finding that the children were ever in imminent danger.

There is some dispute in the record as to how much time elapsed between the time Wahlig set the fire and the time the children exited the house. Even if we accept Wahlig's statement

7

that he set the fire only two minutes before exiting the house, however, the conditions observed by both Oaks and Montague are sufficient evidence for the fact-finder to conclude that the children were in imminent danger. Further, the jury could have determined that—even without the testimony of Oaks and Montague—the simple fact that Wahlig started an uncontrolled fire in the house while the children were inside the house was sufficient to satisfy the test for imminent danger.

The record evidence is both legally and factually sufficient to support the jury's finding that Wahlig placed his children in imminent danger, as alleged in the indictment. *See Vodochodsky*, 158 S.W.3d at 509; *Roberts*, 220 S.W.3d at 524. Accordingly, Wahlig's second and third points of error are overruled.

We reverse the judgment of conviction for burglary of a habitation and dismiss that count of the indictment. We affirm the judgments of conviction for aggravated assault and child endangerment.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed in part; Reversed and Dismissed in part

Filed:   March 27, 2009

Do Not Publish