

# IN THE
# TENTH COURT OF APPEALS

_____

## No. 10-08-00335-CR

_____

**EUGENE WHITE,**

                                                                                    **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                                                                    **Appellee**

_____

**From the 13th District Court
Navarro County, Texas
Trial Court No. 31775-CR**

_____

## MEMORANDUM OPINION

_____

A jury found Appellant Eugene White guilty of the offense of possession of a controlled substance (greater than one gram but less than four grams) in a drug-free zone. The trial court assessed his punishment at seven years' confinement and a $750 fine, but suspended the sentence and placed him on community supervision for seven years. By two issues, White contends that the evidence of the element of possession is legally and factually insufficient to support his conviction. We will affirm.

When reviewing a challenge to the legal sufficiency of the evidence to establish the elements of a penal offense, we must determine whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Our duty is to determine if the finding of the trier of fact is rational by viewing all of the evidence admitted at trial in the light most favorable to the verdict. *Adelman v. State*, 828 S.W.2d 418, 422 (Tex. Crim. App. 1992). In doing so, any inconsistencies in the evidence are resolved in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

> In a factual-sufficiency review, the evidence is reviewed in a neutral light. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *accord Johnson v. State*, 23 S.W.3d [1, 7 (Tex. Crim. App. 2000)]. Only one question is to be answered in a factual-sufficiency review: Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt? *Watson* [*v. State*], 204 S.W.3d [404, 415 (Tex. Crim. App. 2006)]. Evidence can be factually insufficient in one of two ways: (1) when the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust; and (2) when the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust. *Roberts*, 220 S.W.3d at 524 (citing *Watson*, 204 S.W.3d at 414-15; *Johnson*, 23 S.W.3d at 11); *see also Castillo v. State*, 221 S.W.3d 689, 693 (Tex. Crim. App. 2007). "[A]n appellate court must first be able to say, with some objective basis in the record, that the great weight and preponderance of the . . . evidence contradicts the jury's verdict before it is justified in exercising its appellate fact jurisdiction to order a new trial." *Watson*, 204 S.W.3d at 417. A reversal for factual insufficiency cannot occur when "the greater weight and preponderance of the evidence actually favors conviction." *Roberts*, 220 S.W.3d at 524. Although an appellate court has the ability to second-guess the jury to a limited degree, the factual-sufficiency review should still be deferential, with a high level of skepticism about the jury's verdict required before a

reversal can occur. *Watson*, 204 S.W.3d at 417; *Cain* [*v. State*], 958 S.W.2d [404, 410 (Tex. Crim. App. 1997)].

*Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008).

The State was required to prove beyond a reasonable doubt that the accused knowingly possessed cocaine in an amount of more than one gram but less than four grams in a drug-free zone. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.115(a), (c), 481.134(c) (Vernon 2010). To do so, the State had to establish: (1) the accused exercised control, management, or care over the substance, and (2) the accused knew the matter possessed was contraband. *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005). Whether the evidence is direct or circumstantial, "it must establish, to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous. . . ." *Id.* at 405-06 (quoting *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995)). The rule is designed to protect the innocent bystander from conviction based solely upon his fortuitous proximity to someone else's drugs. *Id.* at 406. Mere presence at the location where drugs are found is thus insufficient, by itself, to establish actual care, custody, or control of those drugs. *Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006). However, presence or proximity, when combined with other evidence, either direct or circumstantial (*e.g.*, "links"), may well be sufficient to establish that element beyond a reasonable doubt. *Id.*

Some circumstances that may link a defendant to the controlled substance are: (1) the defendant's presence when the search was executed; (2) the contraband was in plain view; (3) the proximity to and accessibility of the contraband; (4) the defendant

was under the influence of contraband; (5) the defendant's possession of other contraband when arrested; (6) incriminating statements by the defendant when arrested; (7) attempted flight by the defendant; (8) furtive gestures by the defendant; (9) there was an odor of the contraband; (10) the presence of other contraband or drug paraphernalia not included in the charge; (11) the defendant's ownership or right of possession of the place where the controlled substance was found; (12) the drugs were found in an enclosed place; (13) there was a significant amount of drugs; and (14) the defendant possessed weapons or large amounts of cash. *Stubblefield v. State*, 79 S.W.3d 171, 174 (Tex. App.—Texarkana 2002, pet. ref'd); *see also Olivarez v. State*, 171 S.W.3d 283, 291 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *Lassaint v. State*, 79 S.W.3d 736, 740-41 (Tex. App.—Corpus Christi 2002, no pet.); *De La Garza v. State*, 898 S.W.2d 376, 379 (Tex. App.—San Antonio 1995, no pet.). The number of links present is not as important as the degree to which they tend to link the defendant to the controlled substance. *Stubblefield*, 79 S.W.3d at 174; *Williams v. State*, 906 S.W.2d 58, 65 (Tex. App.—Tyler 1995, pet. ref'd).

In this case, Corsicana Police Department narcotics detectives Paul Jauck and William Trent Parker testified that informants notified them that narcotics were being sold out of an apartment located at 901 East 13th Avenue. Jauck and Parker subsequently conducted surveillance on the apartment. During that time, they saw many people coming to the apartment, staying for short periods of time, and then leaving. Based on their training and experience, Jauck and Parker stated that the activity was indicative of narcotics trafficking.

The detectives observed one particular individual frequently coming and going from the apartment. Jauck stated that they received information that this individual was "running the house" and "bringing the dope over to the house for them to sell." Parker stated that they received information that the individual, later identified as Tarrence Green, was operating the distribution of narcotics from the apartment but that three or four black males were inside the residence distributing the narcotics. The detectives never saw White coming and going from the apartment nor did they see him near the apartment while they were surveilling it. But they knew White from a traffic stop and had seen him on the east side of town. Parker stated, "Mr. White was seen at numerous houses, around numerous people that we know sell narcotics."

Jauck testified that after about three weeks of surveillance, he and Parker obtained a search warrant based on an informant seeing drugs in the apartment. During the hour or hour and a half before the search was executed, Jauck watched the apartment and again observed people coming to the apartment, staying for only short periods of time, and then leaving. The visitors were coming and going through the front door. At about 8:00 p.m., approximately four to four and one-half hours after the informant had observed the drugs in the apartment and about twenty to twenty-five minutes from when Jauck had last seen someone leave the apartment, the SWAT team entered the apartment to execute the search warrant.

The officers entered the apartment through a front door that led directly into a small living room. Jauck testified that the living room was about eight feet wide and ten feet long. It contained a television set, at least one chair, and a mattress and box

spring on the floor. A video game was paused on the television. Four people were found inside the apartment: Tarrence Green, D.H., W.S., and White. None of these individuals were among those Jauck had seen coming and going from the apartment during his surveillance of the apartment in the hour or hour and a half immediately prior to the execution of the search warrant.

Officer Dan McIninch, the SWAT team operator and first officer to enter the apartment, testified that when he came in the door, he immediately noticed Green start to run down the hallway. The other three men were in the living room around the mattress. McIninch stated:

> Upon entry, I just know they were at the area of the end of the bed. Whether they were standing up or sitting down, I cannot tell you that. I just remember there were subjects towards the end of that bed area. More than likely, they were already seated because they were down low when we came in. There wasn't much time for them to jump up and run around very much. The one guy that did take off, he was probably already standing because, he was gone so quickly he was probably standing.

The SWAT team officers typically find a suspect, "put them down and secure them," and then make sure the suspect remains in that location so that the officers will know where the suspect was found in relation to any later discovered evidence, weapons, etc. Here, within five seconds of the SWAT team entering the apartment, the suspects were secured on the floor. Green was detained in a bedroom. McIninch did not see any of the men take anything out of their pockets, throw anything on the floor, or move anything before being detained. Except for Green who ran immediately upon the SWAT team's entry into the apartment, the men obeyed the officers' commands.

Parker testified that four officers entered the apartment before he did but that it was only a second between the first officer's entry and his own. When Parker entered, Green had fled to one of the bedrooms, but W.S., D.H., and White were in the living room. W.S. was lying predominantly on the mattress, and White was "going to the floor." Parker did not see any of the men move anything or throw anything out of their pockets. He did not notice the odor of anything burning. Similarly, Jauck stated that he entered the apartment about a minute after the first officer's entry. Green was not in the living room. White was on the ground about two feet from the mattress. D.H. was also on the floor, and W.S. was on the mattress. Jauck also did not notice the odor of anything burning.

Parker testified that he found no evidence that White was living at the apartment. White did not own the apartment nor was he on the lease. Parker said White told them that he was staying at 1600 East 13th Avenue, and Parker had no information that White was ever in the apartment other than on the night the search warrant was executed. Jauck testified that although Green was not on the lease for the apartment either, during the search they found a bill addressed to him at the apartment. Parker stated that the fact that Green was receiving mail at the apartment would probably indicate that he was living there.

Jauck and Parker conducted the search of the apartment. Jauck stated that when he entered the apartment, he observed in plain view pieces of crack cocaine on the mattress, as well as some on the floor on either side of the mattress. Similarly, Parker stated that a total of twenty-one rocks of crack cocaine were in plain view on the

mattress and floor around the mattress and that White was two feet from the crack cocaine. Some of the cocaine was unpackaged, and some of it was packaged in clear plastic baggies that had been rolled up with the corners ripped off. Parker testified that that is how the rocks are packaged for sale. McIninch testified that the cocaine was in the control of everyone in the room because "[i]t was within reach of everybody in that room at the time we made entry." Starla Johnson, a forensic scientist at the Texas Department of Public Safety Crime Lab in Waco, determined that the twenty-one rocks of crack cocaine weighed a total of 2.61 grams.

Parker testified that he saw no evidence that the individuals were actually using crack cocaine in the apartment, and he found no drug paraphernalia in the apartment. But Jauck stated that they found a bag of marijuana in the apartment. They also found cash in the apartment, which commonly becomes relevant evidence in a drug search. Although the money had been scattered, the cash in the living room was separated into three distinct piles. Parker testified that $49 was found on the mattress, $148 was found on a chair, and $42 was found on the floor at White's feet. Jauck stated that if a group of people were dividing up narcotics to sell, it would be normal for each of them to have some cash; therefore, the separate piles of money indicated to him that they were trafficking narcotics.

At some point, the four men were also searched. Although no drugs were found on them, $102 was found in W.S.'s pocket, $52 was found in White's pocket, and Green had $676. The officers found no cash on D.H. When asked whether any of the suspects offered an explanation for all the cash in the apartment, Jauck replied that he heard

someone say that they had been playing dice. The officers did not find any dice, playing cards, or any sort of gambling game in the apartment during the search.

Jauck and Parker also searched a vehicle outside of the apartment. Jauck stated that Green gave him the keys to the car and told him that it was his girlfriend's vehicle. In the driver's seat of the car, Jauck found a "little baggy" that contained trace amounts of cocaine. In a shoe in the backseat of the car, Jauck also found a "dirty bag" that had cocaine residue in it. The shoes in the car belonged to Green. Parker stated that to his knowledge, White had no connection to the car.

The four men were arrested and had their *Miranda* rights read to them. Jauck testified that two of the suspects were determined to be juveniles. Parker stated that W.S. was one of the juveniles. W.S. confessed that five of the crack cocaine rocks were his, but he would not say that all of the crack cocaine belonged to him. Parker testified, "The main thing we were hearing at the apartment, were people trying to get [W.S.] to claim all of the narcotics, which he would not do. He would claim five that were his, and he wasn't claiming for everybody else." Jauck and Parker stated that it is common to have juveniles involved in narcotics trafficking because punishments for juveniles tend to be much more lenient than for adults. Jauck also interviewed White. He did not appear to be under the influence of alcohol or drugs. Neither Jauck nor Parker heard White say anything incriminating. White told Jauck that he had simply been playing the video game.

White testified that he was visiting Corsicana on the day that the search warrant was executed. He was walking down the street, and a couple of his friends were talking

about everyone playing a video game at "Blue's house," so he was intending to meet up with some of his friends there. He now knows that Blue's real name is Tarrence Green.

About thirty minutes before the drug bust, White ran into his sister while walking to the apartment. His sister was going to her friend's house to get her books. White told her to call him when she came back by the apartment so that he could walk her back to their grandfather's house about ten minutes away. White's sister testified similarly that at about 7:30 p.m., she was going to a friend's house to get her schoolbooks when she saw White walking in the street. She asked him what he was going to do, and he replied that he was going to the apartment to play a game. He had never been to the apartment before. He told her to call when she was getting ready to go back to their grandfather's house because he was going to walk her there.

White stated that he went into the apartment at about 7:30 p.m. and noticed the television and then the controller on the floor. He sat down in a chair near the television and started playing the video game with D.H. D.H. had some money on his lap, but White did not ask him about it. That was the only money White saw in the apartment.

White did not know who owned the apartment or who rented it. He had never been in the apartment before that day, and he did not know Green. He had seen W.S. around but did not consider him an acquaintance. He knew D.H. because he knew D.H.'s father. In addition, although he knew what crack cocaine looked like because he had seen it on two prior occasions, he did not see anything that looked like cocaine in the room. He never did anything that required him to move around the mattress. No

one was talking about cocaine or selling cocaine. W.S. was on the mattress. Green had left but later came back. While White was there, no one else came to the apartment.

After White had been at the apartment approximately thirty minutes, the police officers entered the apartment and told everyone to put their hands up and then get on the ground. He laid the controller on the floor and complied with the officers' orders. When he lay down, he was stretched out across about half the living room. He then started asking an officer to come and search him because he did not know what was going on and had nothing to do with it. An officer searched him and took his doo-rag, $52, and the receipt for a money order. White's mother testified that she had sent him $50 via Western Union the prior day. White stated that the officers then handcuffed him, told him his *Miranda* rights, and put him in the police car. Later at the police station, he told Jauck and Parker that he was just at the apartment playing the game, but they did not listen to what he had to say.

White testified that he does not use any drugs or controlled substances, and he has never sold any kind of drug. He did not go to the apartment with drugs or with the intent to purchase or sell drugs, and while he was at the apartment, he never intended to possess or take control over any drugs. The first time he saw the cocaine was when Parker came in and rolled W.S. over on his back. W.S. had been lying on top of the cocaine.

White argues that the foregoing evidence only establishes his presence at the location where the cocaine was found and is thus insufficient, by itself, to establish actual care, custody, or control of the drugs. *See Evans*, 202 S.W.3d at 162. However,

White's presence at the location where the cocaine was found is combined with sufficient other evidence—the crack cocaine in plain view, the location of White within arm's reach of the cocaine, the amount of cocaine, and the amount of cash found in the living room, including on the floor at White's feet and in his pocket—to establish beyond a reasonable doubt actual care, custody, or control of the drugs. *See id.*

Furthermore, the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the witnesses' testimony. *Jaggers v. State,* 125 S.W.3d 661, 670 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (citing *Penagraph v. State,* 623 S.W.2d 341, 343 (Tex. Crim. App. 1981)). The jury may believe all, some, or none of any witness's testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jaggers,* 125 S.W.3d at 670. Thus, the jury was free to disbelieve White's testimony that he was only at the apartment for about thirty minutes before the police arrived and believe Jauck's testimony that he watched the apartment for an hour or hour and a half before the search was executed and never saw White arrive. The jury was free to take all of the evidence into account and to believe or disbelieve any portion of White's version of events.

Viewing all the evidence in the light most favorable to the verdict, the jury could reasonably conclude, beyond a reasonable doubt, that White committed the offense of possession of a controlled substance. *See Curry,* 30 S.W.3d at 406. Also, the proof of guilt is not so weak nor the conflicting evidence so strong as to render the verdict clearly wrong and manifestly unjust. *See Grotti,* 273 S.W.3d at 283. We overrule both of White's issues and affirm the trial court's judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
    Justice Reyna, and
    Justice Davis
Affirmed
Opinion delivered and filed August 25, 2010
Do not publish
[CR25]