

# IN THE
# TENTH COURT OF APPEALS

### No. 10-20-00072-CR

**MICHAEL THOMAS MILBURN,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

### From the County Court at Law No. 1
### Brazos County, Texas
### Trial Court No. 18-01927-CRM-CCL1

## MEMORANDUM OPINION

Michael Thomas Milburn was found guilty by a jury of assault family violence.

*See* TEX. PENAL CODE ANN. § 22.01; *see also* TEX. FAM. CODE ANN. § 71.004.  In three issues,

Milburn contends:  (1) the trial court erred by refusing to instruct the jury on the defense

of consent; (2) the trial court erred by denying his request for a hearing on his motion for

new trial; and (3) he was denied reasonably effective assistance of counsel.  We will

affirm.

## Background

In March 2018, Milburn and his wife were contemplating divorce when a dispute arose. The incident escalated, and Milburn's wife ultimately accused Milburn of assault. Milburn was charged by information with "intentionally, knowingly, or recklessly caus[ing] bodily injury to Melissa Day Milburn, a member of the defendant's family or household, by grabbing her hand and twisting it, pushing her into a wall and onto the ground with his hands, and grabbing her in a bear hug with his arms." The jury found Milburn guilty and assessed his punishment at sixty days in the county jail. The trial court rendered judgment and imposed sentence accordingly.

## Issue One

In his first issue, Milburn asserts that the trial court erred by refusing to include an instruction in the jury charge on the defense of consent.

AUTHORITY

A claim of jury-charge error is reviewed using the procedure established in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). First, we must determine whether there is error in the charge. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we find error, only then will we analyze that error for harm. *Id.* If there is no error, our analysis ends. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012).

It is well settled that a defendant has the right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the evidence. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999); *see Mendoza v. State*, 88 S.W.3d 236, 239 (Tex. Crim. App. 2002). A defense is supported or raised by the evidence "if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). The defendant bears the burden of showing some evidence exists to support each element of the defense. *Juarez v. State*, 308 S.W.3d 398, 404 (Tex. Crim. App. 2010); *see Shaw*, 243 S.W.3d at 657–58. When reviewing a trial court's decision to deny a requested defensive instruction, "we view the evidence in the light most favorable to the defendant's requested submission." *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006). A trial court, however, may refuse an instruction on a defensive theory if the issue was not raised by the evidence. *See Shaw*, 243 S.W.3d at 657–58. Therefore, when the evidence fails to raise a defensive issue, the trial court commits no error in refusing a requested instruction. *McGarity v. State*, 5 S.W.3d 223, 227 (Tex. App.—San Antonio 1999, no pet.).

The defensive issue of "mutual combat" is set forth in section 22.06 of the Penal Code, titled "Consent as Defense to Assaultive Conduct." TEX. PENAL CODE ANN. § 22.06. Section 22.06 of the Penal Code provides, in relevant part, that "[t]he victim's effective

consent or the actor's reasonable belief that the victim consented to the actor's conduct is a defense to [the offense of assault] if . . . the conduct did not threaten or inflict serious bodily injury." *Id.* Consent is defined as "assent in fact, whether express or apparent." *Id.* § 1.07(a)(11).

"[T]he issue (of mutual combat) arises out of an antecedent agreement to fight. The agreement must exist." *Lujan v. State*, 430 S.W.2d 513, 514 (Tex. Crim. App. 1968) (quoting *Carson v. State*, 89 Tex. Crim. 342, 344, 230 S.W. 997, 998 (1921)) (internal quotes omitted). When a party claims the defense of "mutual combat," there must be evidence of an antecedent agreement to fight. *Davis v. State*, 533 S.W.3d 498, 513–14 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd) (citing *Lujan*, 430 S.W.2d at 514, and *Miller v. State*, 312 S.W.3d 209, 212 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd)).

MELISSA'S TESTIMONY

Melissa testified that during an ongoing argument, Milburn showed her that he was typing up the terms of a potential divorce agreement on his cell phone. Melissa said she wanted to see the phone better so she "reached out, not to hurt him" but to get a better look. When she did, Milburn "roughly" grabbed her hand and said, "[D]on't you dare hurt me; the law is on my side." Milburn did not let Melissa look at the phone and read the agreement off to her. After Milburn read the terms, Melissa suggested a couple of things that he had promised her be added to the agreement. Milburn stated that Melissa did not deserve her request and spit in her face. The argument continued, and

Milburn demanded that Melissa turn over the keys to the car and a phone, which Melissa refused to do. Melissa had the keys, phone, and a wallet in her pocket and was "gripping" them with her hand. Melissa again refused to give Milburn the keys and phone, and that is when Milburn "went after [her]." Milburn rushed her, grabbed her hand, and grabbed at her pockets, causing her pocket to rip. Milburn did manage to get her wallet out and tossed it aside because he was after the keys and phone. Milburn came at her again for the keys and phone, and Milburn was being "relentless physically."

Milburn shoved Melissa around and was "body slamming [her] around." Milburn "threw the full weight of his body and shoulders into [her] like a football player would . . . ." Melissa recalled that Milburn hit her with his body more than once and pushed her into a wall. Melissa stated she was able to keep the phone, but Milburn twisted and pried the keys from her hand when he had her arm pinned down and had slammed her hand on the pavement. Melissa guessed that her hand broke when Milburn twisted the keys off her finger because that is when her hand weakened. Her hand began to swell after the incident while talking with law enforcement officers. A fracture of the fourth metacarpal bone was subsequently discovered after an X-ray. Melissa stated that she did not hit, kick, or bite Milburn during the incident and added that she "wasn't trying to do anything to physically harm [Milburn]." Melissa stated she thought about punching Milburn to defend herself but "purposefully held back because . . . if anything happens, it's evidence." At the close of Melissa's direct examination, she confirmed that Milburn

(1) grabbed and twisted her hand, (2) pushed her against the wall, (3) pushed her against the ground, and (4) gave her a "bear hug." Melissa added that she was injured as a result and that she did not consent to "any of that happening."

On cross-examination, Melissa admitted that she could have released the keys and that she chose to struggle to keep the keys. Melissa denied that Milburn could have reasonably believed that she was okay with struggling over the keys and consented to the struggle. Melissa disagreed that by not releasing the keys, she consented. She added that just because they struggled over the keys does not mean she was willing. Melissa explained that during the struggle, Milburn had her hand with both of his hands and slammed her hand to the ground full force, that her hand "simply broke," and that that is when she felt her hand "go weak." Melissa agreed that Milburn intentionally hurt her hand by slamming it into the ground.

MILBURN'S TESTIMONY

Milburn testified that he had personal property in the car and that he wanted the keys so that he could lock up the car to secure the property and to keep Melissa from destroying his possessions. Milburn stated that Melissa did not respond verbally when he asked her for the keys and that she just looked at him angrily and clenched the keys in her fist to make sure he did not get the keys. When Milburn was asked, "So at that point you had a choice to make . . . ," he responded, "Yes." When asked what Milburn chose, he stated, "I chose to engage." Milburn further denied having "any fears that in

the process of forcibly obtaining the keys from [Melissa,] . . . she might be injured" or he might hurt her. When Milburn was asked what he would have done if he had thought he was injuring Melissa while trying to get the keys, he replied, "I would have stopped." Milburn characterized Melissa's statement that he pushed her against a wall as "completely untrue." Milburn further denied he pushed Melissa to the ground or slammed her hand on the asphalt. Milburn described his acts as follows:

> So then my actions of trying to get the keys, the first thing that I did was I went over to her and I gave her a bear hug. I put my arms around her as a way to keep her arms from flailing around, and that would give me a better access of being able to hold her hand. I was then able to take her wrist; and I held it firm, did not twist it, jerk it, or anything, just held it where it would not move while I tried to pry her fingers off of the keys. In the middle of doing that, she kept pulling and struggling and jumping around; and at some point, from the angle of which, I ended up like crouching down, essentially, and she ended up losing her balance and fell on top of me.

Milburn testified that it was Melissa that was "doing all the hopping around, twisting and turning and jumping." When asked whether Melissa caused her injuries to herself, Milburn answered affirmatively. Milburn agreed that during the incident he did not have any intention of hurting Melissa. Milburn agreed, when asked, that what was going on was a mutually consented to struggle over the keys.

DISCUSSION

There is no evidence that Melissa dared, enticed, or induced Milburn to assault her. Indeed, Milburn acknowledged that Melissa said nothing to him when he requested the keys and cell phone from her. Milburn did not testify that Melissa challenged him to

a fight or rushed at him. Milburn testified that he stood still, and that Melissa was the one who flailed about and fell. Milburn noted that when Melissa refused to hand him the keys to the vehicle, it was he who "chose to engage." Milburn's position that the incident was a mutually consented to struggle over the keys does not amount to evidence or raise the issue that Melissa consented to Milburn causing bodily injury to her.

Milburn was not charged with struggling with Melissa but with intentionally, knowingly, or recklessly causing bodily injury.

In our review of the record, we find no evidence of an antecedent agreement by or between Melissa and Milburn to engage in an altercation and no evidence that Melissa ever consented to being assaulted. The fact that Melissa acknowledged she struggled over the keys does not amount to evidence of an antecedent agreement to engage in the altercation or struggle; at most, it is only evidence that she and Milburn were mutually engaged in the struggle once it began. *See Carson*, 89 Tex. Crim. at 344, 230 S.W. at 998; *see also Reed v. State*, No. 02-15-00173-CR, 2016 WL 4491518, at *5 (Tex. App.—Fort Worth Aug. 26, 2016, no pet.) (mem. op., not designated for publication). We find no evidence that Melissa, by her words or actions, expressly or impliedly consented to Milburn assaulting her or that Milburn held a reasonable belief that Melissa consented to Milburn assaulting her. *See Agbor v. State*, No. 02-12-00401-CR, 2013 WL 1830679, at *4 (Tex. App.—Fort Worth May 2, 2013, no pet.) (mem. op., not designated for publication) (finding no consent when defendant and complainant immediately started arguing when

they saw each other, complainant pushed defendant's finger out of the way during argument, and complainant hit appellant first). Without evidence of an express or implied antecedent agreement, we need not reach the question of whether Milburn's testimony impliedly supported the charged conduct. *See Rodriguez v. State*, 629 S.W.3d 229, 237 (Tex. Crim. App. 2021).

Based on the foregoing, we conclude that the trial court did not err by denying Milburn's request for an instruction in the jury charge on the defense of consent. *See* TEX. PENAL CODE ANN. §§ 1.07(a)(11), 22.06; *Bufkin*, 207 S.W.3d at 782; *Ngo*, 175 S.W.3d at 743; *Almanza*, 686 S.W.2d at 171. Accordingly, we overrule Milburn's first issue.

## Issue Two

In Milburn's second issue, he complains that the trial court erred by denying his request for a hearing on his motion for new trial based on an ineffective-assistance-of-counsel claim.

AUTHORITY

We review a trial court's denial of a hearing on a motion for new trial for an abuse of discretion; we reverse only if the decision was so clearly wrong as to lie outside the zone within which reasonable persons might disagree. *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009). A hearing on a motion for new trial is to (1) determine whether the case should be retried and (2) prepare a record for presenting issues on appeal if the motion is denied. *Id.* at 338. A hearing on a motion for new trial is not an absolute right.

*Id.* A hearing is not required when the matters raised in the motion for new trial are subject to being determined from the record. *Id.* But a trial court does abuse its discretion by failing to hold a hearing on a motion for new trial when the motion and accompanying affidavits (1) raise matters that are not determinable from the record and (2) establish reasonable grounds showing that a defendant could potentially be entitled to relief. *Hobbs v. State*, 298 S.W.3d 193, 199 (Tex. Crim. App. 2009).

To establish the existence of reasonable grounds showing that a defendant could be entitled to relief, a defendant is required to support a motion for new trial with an affidavit, either of the defendant or someone else, specifically setting out the factual basis for the claim. *Smith*, 286 S.W.3d at 339. The affidavit need not establish a *prima facie* case, or even reflect every component legally required to establish relief. *Id.* It is sufficient if a fair reading of it gives rise to reasonable grounds in support of the claim. *Id.* However, affidavits that are conclusory in nature and unsupported by facts do not provide the requisite notice of the basis for the relief claimed; thus, no hearing is required. *Id.*

"Under *Strickland v. Washington*, a defendant seeking to challenge counsel's representation must establish that his counsel's performance (1) was deficient, and (2) prejudiced his defense." *Id.* at 340 (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). To show deficiency, a defendant must prove by a preponderance of the evidence that his counsel's representation objectively fell below the standard of professional norms. *Id.* To show prejudice, a defendant must show there

is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* "'Reasonable probability' is a 'probability sufficient to undermine confidence in the outcome,' meaning 'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687, 694, 104 S.Ct. at 2064, 2068). Before a defendant "will be entitled to a hearing on his motion for new trial alleging ineffective assistance of counsel, a defendant must allege sufficient facts from which a trial court could reasonably conclude both that counsel failed to act as a reasonably competent attorney and that, but for counsel's failure, there is a reasonable likelihood that the outcome of his trial would have been different." *Id.* at 340–41.

DISCUSSION

Milburn's affidavit attached to his motion for new trial reads as follows:

My name is Michael Thomas Milburn. I am competent to testify and have personal knowledge of the facts stated in this affidavit. I am the defendant [in] Brazos County cause number 18-01927-CRM-CCLl.

I hired Larry Fatheree to represent me in presenting a defense. I met with Mr. Fatheree concerning the case on several occasions. The only potential witnesses we discussed were present at the time of the events on which the charge was based. Mr. Fatheree never asked me for the names of any other witnesses who could testify for me at the guilt or punishment phase of trial. My parents and grandparents were willing and available to testify for me to refute several of the claims made by Melissa Milburn. If Mr. Fatheree had discussed potential witnesses for the punishment phase of trial I would have had my parents and grandparents contact him to discuss the testimony they could provide.

Mr. Fatheree did review the original police reports with me but as far as I know he did not file any formal discovery requests or requests for notice. He did not discuss any other investigation of the facts of the case beyond the report and documents filed with the court. At trial he did not know that Melissa had surgery after the initial police report.

Milburn's factual allegations that could potentially support a claim of ineffective assistance are that (1) Fatheree never asked Milburn about other potential witnesses for either phase of trial, (2) Milburn's family members were available but not called to testify to refute the claims of Melissa, (3) Fatheree did not discuss any other investigation of the facts of the case beyond the report and documents filed with the court, and (4) Fatheree did not know Melissa had surgery after the initial police report.

We will first address the factual allegation that Fatheree never asked Milburn about other potential witnesses for either phase of trial. Other than Milburn's parents and grandparents, Milburn fails to identify other potential witnesses that he wanted to call at the guilt phase, for what purpose they would have testified, and how the outcome would have differed if the witnesses would have testified. Milburn does acknowledge that he and Fatheree did discuss the witnesses that were present when the assault occurred. Next, we address the factual allegation that Milburn's parents and grandparents were available to testify to "refute several of the claims" made by Melissa. Here, Milburn fails to identify the claims they would have been called on to refute and how the outcome would have differed if the witnesses would have testified and refuted the unidentified claims of Melissa. Next, we look to the factual allegation that Fatheree

did not discuss any other investigation of the facts of the case beyond the report and documents filed with the court. This allegation is only that Fatheree did not discuss with Milburn any additional investigation Fatheree may have conducted, not that Fatheree did not conduct an additional investigation. Again, Milburn fails to identify any new evidence that was undiscovered because of a failure by Fatheree to investigate the case and how the outcome would have differed because of the alleged failure to investigate. Milburn acknowledges that Fatheree did review the police reports with him. Milburn additionally states that "as far as I know," Fatheree did not request formal discovery or request for notice. The phrase "as far as I know" is analogous to the words "to the best of my knowledge," and when such is used in an affidavit, it is no evidence of the facts asserted. *In re Estate of Wilson*, 252 S.W.3d 708, 713 (Tex. App.—Texarkana 2008, no pet.); *Shindler v. Mid–Continent Life Ins. Co.*, 768 S.W.2d 331, 334 (Tex. App.—Houston [14th Dist.] 1989, no writ) (citing *Campbell v. Fort Worth Bank & Trust*, 705 S.W.2d 400 (Tex. App.—Fort Worth 1986, no writ)). Finally, regarding the factual allegation that Fatheree did not know that Melissa had surgery after the initial police report, Milburn fails to demonstrate how the outcome of his trial would have differed if Fatheree knew about the surgery. The record does show that Fatheree had seen the medical records from a medical provider Melissa had seen shortly after the assault and that Fatheree was aware Melissa had a "mildly displaced fracture of the metacarpal."

Even if Milburn's assertion did amount to evidence, there are no factual assertions that a failure to request discovery resulted in an unfair surprise during the trial. There are also no factual assertions that a failure to request notice of other crimes, wrongs, or bad acts resulted in unfair surprise and no factual allegations identifying other crimes, wrongs, or bad acts that were admitted in evidence. There is nothing in Milburn's affidavit that indicates that there is a reasonable likelihood that the outcome of his trial would have been different but for Fatheree's alleged failures. *See Smith*, 286 S.W.3d at 340–41.

The second affidavit attached to Milburn's motion for new trial is from Milburn's grandfather, Jim Jamison. In Jamison's affidavit, he makes the factual assertion that Fatheree never contacted him, nor did he contact Fatheree because he did not know he could have testified. All other factual assertions by Jamison in his affidavit relate to his testimony had he been called to testify.

Because Milburn's motion for new trial asserting ineffective assistance of counsel fails to explain how Fatheree's allegedly unprofessional errors prejudiced Milburn, Milburn has failed to show that, but for counsel's deficiency, the result would have been different. Milburn is therefore not entitled to a nondiscretionary hearing on his motion for new trial. The trial court did not abuse its discretion by not conducting a hearing on the motion. Accordingly, we overrule Milburn's second issue.

**Issue Three**

In Milburn's last issue, he asserts that his trial counsel was ineffective because he did not conduct an independent investigation or interview other potential witnesses, respectively.

AUTHORITY

Our review of counsel's representation is highly deferential, and we will find ineffective assistance only if an appellant overcomes the strong presumption that his counsel's conduct fell within the range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. The right to "reasonably effective assistance of counsel" does not guarantee errorless counsel whose competency is judged by perfect hindsight. *Saylor v. State*, 660 S.W.2d 822, 824 (Tex. Crim. App. 1983) (per curiam). "Isolated instances in the record reflecting errors of commission or omission do not cause counsel to become ineffective, nor can ineffective assistance of counsel be established by isolating or separating out one portion of the trial counsel's performance for examination." *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990).

Trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective. *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). When the record is silent, as in this case, regarding the reasons for counsel's conduct, a finding that counsel was ineffective requires impermissible speculation by the appellate court. *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996,

no pet.). Thus, absent specific explanations for counsel's decisions, a record on direct appeal will rarely contain sufficient information to evaluate or decide an ineffective-assistance-of-counsel claim. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). "[A]n application for a writ of habeas corpus is the more appropriate vehicle to raise ineffective assistance of counsel claims." *Rylander*, 101 S.W.3d at 110. To warrant reversal without affording counsel an opportunity to explain his actions, "the challenged conduct must be 'so outrageous that no competent attorney would have engaged in it.'" *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

DISCUSSION

Milburn filed his motion for new trial alleging, among other things, that his trial counsel's performance was deficient because he failed to: (1) adequately investigate the facts of the case to prepare for trial; (2) request discovery from the State under article 39.14 of the Code of Criminal Procedure; (3) request notice of the State's intent to offer evidence of other crimes, wrongs, or bad acts under Rules of Evidence 404(b) and 609 and article 37.07 of the Code of Criminal Procedure; and (4) ask Milburn for any potential punishment phase witnesses. In support of his motion for new trial, Milburn attached two affidavits, one from him and one from Milburn's grandfather.

Milburn's own affidavit undermines some of the contentions made in the motion for new trial that counsel was ineffective. Specifically, Milburn admitted that his trial

counsel reviewed "the original police reports" and "documents filed with the court" with him. Moreover, the State contends on appeal that Milburn's trial counsel requested and was provided with discovery. Milburn acknowledged in his affidavit that trial counsel discussed with him potential witnesses that were present at the time of the assault. Milburn also asserted that trial counsel did not speak with him about potential witnesses for the punishment phase of trial. But the record reflects that Milburn testified during punishment, and he could have testified to the same information regarding his church activities and his Boy Scout membership that his grandfather allegedly would have.

Milburn also complains about trial counsel's failure to request notice of the State's intent to offer evidence of other crimes, wrongs, or bad acts under Rules of Evidence 404(b) and 609 and article 37.07 of the Code of Criminal Procedure. However, he does not explain how he was prejudiced by this omission. Nor does he identify specific evidence of other crimes, wrongs, or bad acts that were admitted during trial.

To the extent that Milburn argues that the trial court's denial of a hearing on his motion for new trial deprived him of an opportunity to develop the record on his ineffective-assistance-of-counsel claim, the affidavits attached to Milburn's motion for new trial, as we noted above, did not allege sufficient facts from which a trial court could reasonably conclude both that counsel failed to act as a reasonably competent attorney and that, but for counsel's failure, there is a reasonable likelihood that the outcome of his trial would have been different. *See Smith*, 286 S.W.3d at 341.

The record before us is completely silent as to counsel's strategy on all of the grounds raised by Milburn. A record such as this cannot adequately reflect the failings of trial counsel sufficiently enough for an appellate court to fairly evaluate the merits of such a serious allegation. *See Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011).

Accordingly, on this record, we cannot say that Milburn has established that his trial counsel was ineffective. *See Smith*, 286 S.W.3d at 339–41. We therefore overrule Milburn's third issue.

## Conclusion

We affirm the judgment of the trial court.

MATT JOHNSON
Justice

Before Chief Justice Gray,
     Justice Johnson, and
     Justice Smith
Affirmed
Opinion delivered and filed April 6, 2022
Do not publish
[CR25]

